THE PEOPLE v. THE NEW YORK CENTRAL RAILROAD
COMPANY.

The tolls imposed, at the time of the adoption of the Constitution of 1846, on freight carried on railroads, were not, within the meaning of that instrument, part of the revenues of the State canals, though payable to the commissioners of the canal fund.

The act (ch. 497 of 1851), repealing the laws imposing such tolls is, therefore, consistent with article 7 of the Constitution, which irrevocably pledges the revenues of the canals to the payment of certain debts, and to their completion; and the act is valid.

APPEAL from the judgment of the Supreme Court sitting in the second district, affirming the judgment of Justice BROWN at the Orange Circuit, dismissing the complaint.

The action is to recover tolls which would have accrued and become payable to the State from the defendant, and the several corporations which were consolidated and merged in the defendant at its organization, under laws in force when the present Constitution of the State was adopted, had these laws remained in force.

The defendant, "The New York Central Railroad Company," came into existence in 1853, by the consolidation of several railroad corporations, under the provisions of chapter 76 of the Laws of 1853. The provisions of the charters of the several companies merged in the defendant, concerning the carriage of merchandise and freight other than the baggage of passengers, and the toll or tax to be paid upon the merchandise and freight carried when the right existed, were not uniform; the right to carry such freight not being conferred upon some of the corporations, while to some the right was granted during parts of the year, and to others during all the year; some being compelled to pay toll upon the property transported, from which other companies were exempt. In 1844, by statute, the right was conferred upon all the roads to carry freight, during the suspension of canal navigation, and the companies were required to report to the commissioners of the canal fund

as they should direct, and, with certain exceptions as to local freight on some of the roads, to pay to the said commissioners "the same tolls per mile on all the goods, chattels and other property so transported, as would have been paid on them had they been transported on the Erie canal." This law was in force when the Constitution of 1846 was adopted. In 1847 the law was amended, and in 1851 it was repealed, and the right to carry freight without the payment of toll granted to the several railroad companies. It is claimed by the plaintiffs that 'the last mentioned act is in contravention of the Constitution, and, hence, that the defendant, as the successor in interest and liability of the several consolidated companies, is indebted to the State for the tolls, under the acts of 1844 and 1847, upon all the goods transported by the several roads after December, 1851, when the repealing act took effect, and before the organization of the defendant, and by the defendant, since the consolidation.

*Charles G. Myers* (late Attorney-General), for the appellants.

*Lyman Tremain* (with whom was *A. C. Paige*), for the respondent.

ALLEN, J. An elaborate or extended discussion of the rules of constitutional and statutory interpretation, would be out of place at this time. The recent and frequent consideration and application of these rules by the courts has made them quite familiar, and leaves us but little to do in this case, important and interesting as it is, but to suggest them as their application becomes necessary in the progress of the discussion. One or two general remarks, particularly applicable to a written Constitution, may be proper, as connected with the first and most important canon in the interpretation of written instruments.

A Constitution is an instrument of government, made and adopted by the people for practical purposes, connected with the common business and wants of human life. For this reason preëminently, every word in it should be expounded in its

The People v. The New York Central Railroad Company.

plain, obvious and common sense. (Story on Const., § 451; per JOHNSON, J., *Newell* v. *People*, 3 Seld., 97.) Intimately connected with this idea, and giving force to the principle of interpretation resulting from it, is the fact prominently put forth by Judge DENIO, *arguendo*, in *Newell* v. *People* (*supra*), and which, while it commends itself to the good sense of all, is abundantly supported by authority, that a written Constitution, framed by men chosen for the work by reason of their peculiar fitness, and adopted by the people upon mature deliberation, implies a degree of deliberation and a carefulness of expression proportioned to the importance of the transaction, and words are presumed to have been used with the greatest possible discrimination. Chief Justice MARSHALL, in *Gibbons* v. *Ogden* (9 Wheat., 188), in interpreting a provision of the Constitution of the United States, says: " As men whose intentions require no concealment generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they said."

Judge JOHNSON, in *Newell* v. *The People*, speaking of the rule that " that which the words declare is the meaning of an instrument," says: " This is true of every instrument; but when we are speaking of the most solemn and deliberate of all human writings, those which ordain the fundamental law of States, the rule rises to a very high degree of significance.". In the language of Judge BRONSON, in *People* v. *Purdy* (2 Hill, 31), " we are not at liberty to presume that the framers of the Constitution, or the people who adopted it, did not understand the force of language." In construing and giving effect to a written Constitution, wherever the language of the instrument is clear, it must be taken to express the mind and will of the people; and to depart from it by substituting another interpretation, under pretence of giving effect to the intent of its framers, would be dangerous and mischievous in the extreme.

The first and fundamental rule in the interpretation of all instruments, and especially necessary to be observed in the interpretation of a written constitution for the government of a State, as we have seen, is to give effect to the meaning of the parties; and this meaning is to be sought in the words primarily, and, in case of ambiguity or doubt, in the context, the subject matter, and the reason and purpose of the instrument. Words are generally to be understood in their usual and most known signification, unless they have acquired a technical meaning; and then it is the office of interpretation to determine, by reference to the context, the subject matter, and the circumstances under which they are used, whether they are used in the ordinary or in a technical sense. When the words are plain and free from ambiguity, and of themselves having a distinct and perfect idea, they require no interpretation; and it should only be indulged from a clear necessity, either to escape some absurd consequences or to guard against some fatal evil. (Story on Const., §§ 400, 401, 405; *Newell* v. *People, supra;* Smith on Const., 649, 651; *McCluskey* v. *Cromwell,* 1 Kern., 593.)

The question first in importance presented upon this appeal grows out of the direction given by the State Constitution to the "canal revenues;" and is, whether the toll or tax, imposed by laws in force at the time of the adoption of the Constitution upon merchandise carried by railroad companies, was included within that term, and made a part of the "canal revenues" appropriated by the seventh article of that instrument.

The first section directs that, "after paying the expenses of collection, superintendence and ordinary repairs, there shall be appropriated and set apart in each fiscal year, out of the revenues of the State canals, in each year, commencing on the first day of June, one thousand eight hundred and forty-six," certain sums, as a sinking fund for the payment of the canal debt; and that "the principal and income of the said sinking fund shall be sacredly applied to that purpose."

The second section, after complying with the provisions of the first section, appropriates and sets apart "out of the sur-

plus revenues of the State canals" certain sums for the payment of the general fund debt, with a like declaration of the sacred application of the "principal and income of the said sinking fund" to the purpose indicated.

The third section directs that, "after paying the said expenses of superintendence and repairs of the canals, and the sums appropriated by the first and second sections of this article, there shall be paid out of the surplus revenues of the canals to the treasury of the State" certain sums for the use and benefit of the general fund; and that "the remainder of the revenues of the said canals shall" be applied to the completion of the canals mentioned.

The fifth section provides that if the sinking funds, or either of them, should prove insufficient to meet the claims upon them, the legislature should, by equitable taxes, "so increase the revenues of the said funds" as to make them sufficient to preserve the credit of the State; and that "every contribution or advance to the canals or their debt from any source, other than their direct revenues, shall," with interest, be "repaid into the treasury for the use of the State out of the canal revenues, as soon" as it can be done, consistently with the just rights of the holders of the canal debt.

Seeking the meaning of the framers of the instrument only from the words they have used, and giving these words their ordinary signification, the sense in which they are popularly used, and in which they would be understood by the people who adopted, and for whose government the Constitution was intended, the "revenues," of the canals would include only the income derived from the "State canals." This would include tolls, penalties, and rents of surplus water, and any other return which the State might receive from the capital invested in the canals. Revenue, when used of individuals, is equivalent to income, which is the true sense generally used to designate the annual receipts, and includes receipts from all sources — at least, all permanent sources of profits or rent. Revenue is more generally used to designate the income of the government, arising from taxation, duties and the like. The

proceeds of lands or public stock sold would not be included as a part of the revenue of a State. (Story on the Const., § 877.) The State canals cannot possess a revenue or income. They may be a source of profit, that is, revenue, to their owner. In the interpretation of a Constitution, we' may not look for "metaphysical or logical subtleties, for niceties of expression," for metaphor, or figures of speech of any kind; and we are not at liberty to suppose that the framers of the article under consideration, either from necessity or choice, intended to impersonate the "State canals," and treat them as capable of taking and holding property, being entitled to and receiving an income. It is not necessary, in order to give effect to the instrument. Every word can have full force given to it without doing so great violence to the rules of interpretation. Even *if the language* were not critically accurate to denote the profits or income which should accrue to the State from the use of the canals, and "revenues *from* the canals" would have been the more appropriate expression, still, critical propriety is not essential to the right understanding of the provision; and it would be safer to convict the framers of false grammar than, in the exercise of a critical acumen, and to save them from this error, to give to the principal idea an unusual and figurative meaning. But I think the language well chosen to convey the idea, and restrict the legislative power over the receipts from the canals. "Revenue" is a return for capital invested or labor bestowed. In a general sense, it is the annual rents, profits, interests or issues of any species of property, real or personal, belonging to an individual or the public. (Web. Dic.; *People* v. *Supervisors of Niagara,* 4 Hill, 20.) The "produce of taxes, excise," &c., is the amount they yield to the State. The "revenue" or "income" of a farm is the sum total which its owner receives from it. It is not the money borrowed by the owner, or an annuity which he may own and may have pledged to pay for it, or the money invested in stock, farming utensils, or fertilizers put upon it. The canals, as the property of the State, were a source of income to it; and the "revenues of the canals" was significant,

as denoting that income. There is no ambiguity in the words, and therefore no occasion for resorting to the other aids allowable in the interpretation of doubtful or ambiguous phrases. In other parts of the sections quoted the same form of expression is used to describe the receipts from a given fund or capital; as where, in sections one and two, the principal and income of the sinking funds are mentioned. The framers distinguished very clearly between the annual payments, or contributions to those funds, and the profits arising from their investment; and did not deem it necessary to mention the latter as the "income from" the capital, but used the same preposition, "of," as when giving directions concerning the "revenues of the canals." The other parts of the sections, embracing the provisions under consideration, give no countenance to the claim, that anything but receipts from the canals were intended by "the revenues of the State canals." The "expenses of collection, superintendence and ordinary repairs," in the first and third sections, can refer to nothing but the canals, and cannot, by any latitude of interpretation, embrace railroads or any other subject; and yet, they have no more intimate connection, but precisely the same, in the section with "State canals" that "revenues" have. To suppose that in the one phrase the framers intended just what they said — the expenses attendant upon the management of the canals — and in the other they meant contributions of all kinds for canal purposes, and all restrictions and impositions upon commerce for the benefit of the canals or to increase their trade, would be to convict them of a carelessness and a want of appreciation of the importance of giving clear and distinct expression to their meaning, which would be unjust, and a violation of the rule which implies care and deliberation in such a transaction. The direction in the fifth section for the repayment from the canal revenues of every contribution or advance to the canals, or their debt, from any source other than their direct revenues, is in harmony with and supports the interpretation given to "canal revenues." In the preceding paragraph of the section the legislature were enjoined

to increase the revenues of the sinking funds, for which provision had been made in the sections immediately preceding, with a view to sustain the public credit and preserve the public faith, by equitable taxes, if the funds or either of them should at any time prove insufficient to satisfy the claims of creditors as they became payable. One of these sinking funds was for the payment of the canal debt; and hence the provision referred to, that every contribution or advance from any source, other than their direct revenues, was to be a charge upon the canal revenues. Had it been contemplated that the sinking fund for the canal debt was to be made up in part of taxes upon commerce, tolls upon railroad freights, or other auxiliary or indirect contributions, the framers of this section would not have been so careful to indicate that all contributions and advances, other than from the direct revenues of the canals, should be repaid from such revenues. The provision for a repayment of the advances was intended as an equitable adjustment of the accounts between the direct revenues of the canals, which had been appropriated in the preceding sections, and the other funds and revenues of the State which might be used in their aid in an emergency and to meet demands upon them.

The words in question, as used by the framers of the Constitution, have a clear, distinct and definite meaning, well understood and easy of application, in the sense in which they are popularly used, and as they would be understood by the people in adopting the instrument, and are used with propriety in that sense in the places in which they occur, and convey to the reader an intelligent, clear and practical idea upon the subject to which they relate. By themselves, the sections in which they occur are perfect · establishing a complete, permanent system as connected with the canals, and giving permanent direction to the revenue to be derived from the canals, and adjusting the claim of the general fund upon them and providing for its payment. There being no ambiguity in the terms employed, or doubt growing out of the language, there is no room for interpretation or occasion or propriety to resort·

The People *v.* The New York Central Railroad Company.

to those extrinsic aids which are sometimes necessary when the instrument is not, by its directness and clearness of expression, its own interpreter. It is only when the language is not thus distinct and free from doubt that the intention and meaning of an instrument may be sought from other sources. It is a pregnant fact that it was only after twelve years of administration of the Government under the Constitution—a period extending over more than one-half the contemplated existence of the instrument—that it was first suggested that, possibly, "canal revenues" meant something more than was indicated by the term, and included other sources of State revenue and other subjects of taxation; and this suggestion was not based upon the language of the instrument, but upon extrinsic facts, and, in disregard of the primary rule of interpretation, by seeking to create a doubt, rather than to remove it, which is the office of extrinsic facts, when brought in as aids of interpretation.

But if, departing from the rule referred to, we resort to the context, the subject matter, the past legislation and financial history of the State, and the reason and spirit of the requirement, to see if some meaning may not be given to its language other than that which it evidently imports, the result will not be different.

The seventh article of the Constitution declares, that the capital of the funds therein named shall be preserved inviolate, and directs to what purposes the "revenues of" the several funds shall be appropriated. Here the revenues of those funds is the form of expression adopted by the framers as equivalent to "income" from those funds. These funds, or the capital invested and constituting them, are ranked as property yielding a revenue to the State, but it is spoken of as "the revenue of" the funds. What is intended by it is the annual produce of these funds, and the same language is used in the seventh article, to distinguish and give direction to the income from the State canals. The "revenue of the common school and the literature fund" did not embrace all the casual or extraordinary or even the ordinary contributions to the capital

of the funds or the aids and auxiliaries to the revenues of those funds, which have been contributed from year to year as the necessities of schools and institutions of learning required. The necessity of keeping separate accounts with the several funds and sources of revenue of the State, with reference to the objects to which distinct portions of the revenue are appropriated and set apart, has given occasion to the convenient form of expression adopted, which fully answers the desired purpose, and effectually and intelligibly secures the public against a misappropriation or a diversion of the public funds from the purpose to which they are directed. The object being a very simple one, it was not necessary to seek critical accuracy in the use of words or resort to an elaborate, special phraseology to accomplish it. It was thought best to do it by such simple and natural designation of the subject matter as would be easily understood and could not mislead.

From an early period in the history of the State, distinct funds were created for special purposes, and the income from these funds, or the "revenues of" such funds, applied to the respective objects in view in their creation. Among these were the "common school fund," the "literature fund," and the "general fund," which latter of late years is only known by the debt charged upon it, the fund itself being a myth. The legislature have, from time to time, designated and set apart to these several "funds," as belonging to the particular department of government named, certain stocks, debts, property, and other sources of revenue, and declared that the subjects so set apart and designated should be known as the particular "fund" mentioned. (1 R. S., 189, 196, 197.) The existence of these "funds" is recognized by the Constitution, and certain of the funds, not, however, including the "canal fund," it is declared "shall be respectively preserved inviolate." (Const., art. 9.) Except as prohibited by the Constitution, these funds, as well their capital as their income, have been ever subject to legislative control. The canal fund is only incidentally mentioned in the Constitution of 1846, in naming the "commissioners" of that fund. (Const., art. 7, § 5.) If the tax on

merchandise transported upon railroads had been, at the time of the adoption of the Constitution, a part of the canal fund, it would nevertheless have been subject to legislative control, and would not have had the sacred and inviolable character impressed by the Constitution upon the common school, literature, and United States deposit funds. The only way in which such tax could have been devoted to canal purposes without a strange departure from the ordinary method of managing the State finances would have been to make it a part of the "canal fund," as has been done in some instances. One such instance is to be found in the Laws of 1841, chapter 238, section 4. But even in that case it would not have been beyond the reach of ordinary legislation, as the Constitution, declaring certain funds inviolable, does not include within the number the canal fund. *Expressio unius est exclusio alterius.* The "canal fund" was created in 1817 (Laws of 1817, p. 301), as a part of the system of internal improvement then inaugurated, and then consisted of all such appropriations, grants and donations as might be made by the legislature of the State, by the Congress of the United States, by individual States, and by corporations, companies and individuals.

By the fifth section of the same act, salt and auction duties and the tax upon steamboat passengers, commuted by the act of 30th of March, 1820, were pledged and appropriated to the construction of the canals and the payment of the canal debt; and yet, although thus devoted, the Constitution of 1821 regarded them, not as "canal revenues," but as auxiliary funds, and distinguished between them and canal tolls, or "revenues of the canals" proper, while it made the appropriation of them to the purpose indicated equally inviolable. (Const., art. 7, § 10.) By the act of 1817, the net proceeds of the canals, when made, were also pledged and appropriated to the payment of the canal debt. This is precisely what the Constitution of 1846 does, that is, it appropriates the "net proceeds" of the canals; and yet the framers of the Constitution of 1821, taking the law of 1817 as the basis of their action, did not regard this item as embracing the other funds devoted to the

same purpose by the same act, but, with much unnecessary verbiage and circumlocution, if the plaintiffs are right in their construction, dealt specially with each item which they intended to pledge to the work of completing the canals. In 1830, the canal fund consisted of seven distinct items, only three of which were the earnings or products of the canals, to wit, tolls and commutation moneys, moneys received for penalties and damages under the canal laws, and moneys received for the sale or use of surplus waters. (1 R. S., 293.)

The other contributions to the canal fund were always regarded as funds "auxiliary" to the canal revenues proper, or the "net proceeds" of the canals, and were so known in official and legislative reports and documents, and they were so treated and distinguished by the Convention that framed the Constitution of 1846, and in the report of the Comptroller, made in answer to a call of the Convention for the different items of the canal fund, and "the revenues of the Erie and Champlain canals for each year, and their expenses for repairs, superintendence and collection, and their net revenues," and "the revenues of all the canals, as a system, for each year, and their net revenues." The information called for was given in different tables, classifying the different items of the canal fund, and reporting the "auxiliary funds" by themselves, and the "revenues of the canals," that is, tolls, &c., in a table by themselves. (Conv. Doc., No. 47.) It is not reasonable to suppose that the Convention immediately forgot or intentionally disregarded the form of their inquiry and of the report, as well as the distinction between the "State canals" and the "canal fund," and between the "revenues of the canals" and the "auxiliary funds." The "revenues" of or from the canals were the subject of annual official reports to the legislature, and had, at the time of the sitting of the Convention in 1846, a well-defined meaning, and were understood as including only the receipts from tolls, surplus waters, &c., and thus induced the particular form of the inquiry for the statistics, to enable the Convention understandingly to consider the State finances as particularly connected with the canals. (See the annual

reports of the Commissioners of the Canal Fund, and especially for the years 1839, 1840 and 1842.) It is claimed that, by the Constitution of 1821, not only were the tolls of the canals, at the rates then fixed, pledged for the completion of the canals, and the payment of the canal debt, but, also, the faith of the State was pledged against, and the legislature were prohibited from doing, any act or authorizing any work which should divert trade from the canals, and thus diminish the receipts: that this view was taken of it by the legislature, and acted upon in granting railroad charters and in the imposition of railroad tolls. From this it is argued that, in 1846, tolls proper, and that which was a substitute for canal tolls, that is, the tax upon merchandise carried by the railroad companies, and which could not be constitutionally carried by the railroad except upon the payment of an equivalent to answer the constitutional pledge, were regarded as "revenues of the canals," any part of which was equally sacred, and pledged to the same purposes by the Constitution then adopted. If the premises are wanting, the argument must fail. I will not spend time in considering the restrictions upon the legislative power claimed for the Constitution of 1821. It is sufficient to say, that the regulation of all matters connected with the internal traffic and commerce of the State, the development of its wealth and resources, the advancement of its material interests, either by constructing or authorizing the construction of routes and means of communication and commerce between different parts of the State by land or water, is clearly within the legislative power, which, by the Constitution, is vested in the Senate and Assembly. A restriction upon the legislature in respect of a matter which is properly the subject of legislation will not be implied, but must be clearly expressed. The implication claimed in this case is very far-fetched. It will not be presumed, in the absence of a clearly expressed intent, that it was designed to cripple the power of the legislature in so important a part of its duties, and to deprive it of the power to develop the resources of the State and attract within its limits the commerce and trade of other States by making

available private enterprise or by creating other facilities for travel and transportation, or by any means which were accessible. (*People* v. *Draper*, 15 N. Y., 545; 21 Wend., 543; 1 Hill, 324; 18 Wend., 9; 19 N. Y., 445-463.)

There is no evidence upon the statute-book that the legislature gave to the Constitution of 1821 the effect claimed for it in behalf of the plaintiffs. The first railroad chartered was the "Mohawk and Hudson," between Albany and Schenectady, making the distance between the two cities less by one-half than by the canal; and thus very likely to interfere severely with the traffic upon the canal. This road was permitted to carry freight, and no tax or toll was imposed upon the freight so carried. (Laws of 1826, ch. 253.) The same may be said of the Troy and Schenectady Railroad Company, chartered in 1836. (Laws of 1836, ch. 427.) The railroad system was inaugurated by the incorporation of the Mohawk and Hudson Company; and in that, there is no recognition of the right of the canals to the carriage of all the merchandise that could be forced into that channel by the prohibition of every other means of transportation; and from that time railroad charters were granted with diverse provisions as to the carriage of freight, granting or withholding the right, and imposing tolls or not, as circumstances made it expedient in the eyes of the legislature; but, evidently, without any thought that the Constitution had anything to do with it. The Tonawanda railroad, incorporated in 1832, the Attica and Buffalo, incorporated in 1836, had the right to carry freight without the payment of tolls. The Auburn and Syracuse Railroad Company, incorporated in 1834, was authorized to carry freight, but was required to pay the same tolls as were paid on the Erie canal. The Syracuse and Utica Railroad Company, incorporated in 1836, was authorized to carry freight, but was required to pay for such goods as should be carried by it during the season of canal navigation only "such tolls as the canal board should deem proper, not exceeding" the rates charged upon the canal. If this toll or tax had been imposed in obedience to the Constitution, there could have been no

discretion vested in the canal board; but it would have been the same as the canal toll. The Utica and Schenectady Railroad Company, chartered in 1833, was prohibited from carrying freight. The Auburn and Rochester, incorporated in 1836, was prohibited from transporting persons or property in such a manner as to lessen the income on the Erie canal during the time when the canal was navigable. It is not necessary to refer to other acts of incorporation. The entire want of uniformity in the charters renders them of no value as aids in the interpretation of the Constitution. There is certainly no evidence in any one of them, and less than none when all are looked at in connection, that the legislature supposed they were following a constitutional requirement in giving or withholding the permission to carry merchandise, or charging merchandise carried, or exempting it from the tax. In no instance, I think, save in the charter of the Auburn and Rochester railroad, were tolls imposed in respect to persons carried by the railroad companies; and yet, tolls on passengers were as clearly within the provision of the Constitution as tolls on merchandise. In 1844, permission was granted to the Utica and Schenectady Railroad Company to transport upon its railway goods, &c., upon the payment of the same tolls per mile on all the goods, &c., so transported, as would have been paid on them had they been transported on the Erie canal; and the necessary provision was made for the carriage of freight by the other connecting roads in the line of railroad between Utica and Buffalo, upon a payment of like tolls, except as to local freight upon certain of the roads having the right to carry such freight free of toll. The tolls to be paid under the act were directed to be paid to " the commissioners of the canal fund." (Laws of 1844, p. 518.) Perhaps, by the latter direction, the tolls received for property carried upon railroads may properly be considered as added to the "canal fund." It is not material whether this be so; for as part of the canal fund, as we have seen, it is subject to the legislative discretion, unless controlled by some express constitutional prohibition upon the legislative power  There

is, then, nothing in the provisions of the act, or in the language or terms in which these provisions are embodied, to give countenance to the idea that these tolls were in any sense regarded as "canal revenues;" or "revenues of the canal," so as to justify the inference that the latter term, in the Constitution of 1846, was intended to embrace them. But little will be gained by speculating upon the motives and policy of the act. If it be not established that the tax upon the railroad traffic was imposed in obedience to the requirements of the Constitution, then a knowledge of the inducements that led to the passage of the act would only be important to elucidate some doubtful or ambiguous provision. The act is clear and explicit in its terms, and needs no such aid to interpret it. If the canals could and would have secured the carriage of all the goods, &c., that were permitted to be transported by the railway companies, and the State would not be the gainer in its commerce, but would only lose by the amount of the tolls upon such as should be diverted to the roads, then, as the right granted was a boon to the roads, there was an apparent equity in charging the freight with the tax. The imposition of the tolls would be then simply a question of expediency or policy, and would belong exclusively to the statesman and political economist. If the springing up of rival routes for the commerce of other States, and the carriage of merchandise and produce which it was desirable, with reference to the interests of the whole State, to retain or acquire, with which the canals could not compete, rendered necessary the very facilities which the railways afforded, there was a good reason for conferring the power upon the railway companies to carry the freight, and the imposition of the toll would not be as a consideration of a boon, but would be referable to some other reason. Perhaps the necessities of the State might, in that view, be considered as having an influence upon legislative action in this respect. The financial history of the State, culminating in a great depreciation of the public credit, and the stoppage of the public works, and the necessity of a resort to direct taxation to keep the faith

of the public with its creditors but ten years before the passage of this act, will not be forgotten. By an act passed the same year (ch. 314), money was authorized to be borrowed to pay arrearages to canal contractors, and other claims upon the canal fund, and a direct tax was levied for its reimbursement. It may be remarked, in passing, that, in the same act, the net earnings of the canals are called "the surplus of canal revenues," as they are called in the Constitution of 1846. But probably the necessitous condition of the State was regarded as a justification, if not as calling, for the imposition of tolls upon railroads, as an equitable tax upon trade that might otherwise directly contribute to the canal fund by way of tolls for transportation upon the canals.

The act of 1842 (Laws of 1842, ch. 114) has the same author as article 7 of the State Constitution; and we may suppose that language was used with at least the same care in the latter instrument as in the act referred to. They both relate to the same subject, and both embody the same general views and principles. In the act, at section 11, care is taken to distinguish between the revenue of the State canals from canal sources and revenue for canal purposes from the State tax; and when the latter is intended to be included in a disposition of the canal revenues, it is expressly mentioned. Had annual contributions from any source other than the canals been intended to be classed with and disposed of as a part of the canal revenues proper by the Constitution, language free from all doubt would have been employed for that purpose. If the act of 1842 does not throw light upon this part of the Constitution, there is no legislation that can aid us; and so far as that act speaks, it is against the construction urged by the plaintiffs.

The purpose and object of this part of the Constitution, so far as indicated by its terms, or to be inferred from the canal and financial policy of the State, do not favor the views and claim of the plaintiffs. 1. It was not adopted for the benefit of the creditors of the State, and as a pledge or mortgage of the revenues of the State for the payment of the debt. 2. It was not adopted to increase the revenues of the canals, or

secure to them the commerce of the State, or protect them against competition or rivalry from any source. It was not the theory of the framers of the article that commerce was created or should be controlled for the benefit of any particular channel; but routes and channels were provided for the benefit and to meet the wants of commerce. It would have been a departure from the entire canal policy of the State in the past, by a rigid and unyielding constitutional restraint upon legislative power, to have made the greater interests of the whole State defer to the particular interests embodied in or represented by the "State canals" or the "canal fund." True, the different views and policy of different men are, from time to time, impressed upon the legislation of the State. But the general purpose and object of the canals are set forth in the preamble to the act of 1817; and there is no evidence that that purpose and object have ever been lost sight of or renounced. The purpose is worthy of the men who projected the enterprise, and of the State that accomplished it. It was, "to promote agriculture, manufactures and commerce, mitigate the calamities of war and enhance the blessings of peace, consolidate the Union, and advance the prosperity and elevate the character of the United States." Direct revenue was not among the objects and purposes of the great undertaking. It was an incident, and so regarded by the founders of the system. True, it was important that the work should, when completed, be self-sustaining, and desirable that it should yield a revenue; but the exalted and more important ends of the work—the blessings and benefits which were expected to result—were not intended to be sacrificed to the smaller benefits of revenue, especially revenue in excess of expenditure in the construction and maintenance of the works. 3. The purpose and object of article 7 of the Constitution, so far as it relates to the "revenues of the State canals," was, by the imposition of a restraint upon legislative discretion and action, to secure an economical administration of the earnings of the canals and the rigid and faithful application of them to the payment of the equitable claims upon them, and as justice to

every part of the State and the different funds of the State required. If the canals could not, for any reason, accomplish the great purposes for which they were commenced and completed, but other facilities — the result of new inventions and new modes of travel — could effect the desirable object, there was no inhibition upon the legislature as to their employment, although the tolls of the canals might be thereby diminished. That is, the legislature were not, expressly or impliedly, enjoined to protect and guard the canals and their business and revenue at the expense of every other interest, by a prohibition from doing, or suffering to be done, anything that might diminish the receipts from canal sources. They were only told how to deal with the tolls they should receive, should they be more or less. They might reduce them to a nominal sum, if the interests of the State and its commerce should require it. It was not the intention of the framers of the Constitution to restrict, during the lifetime of a Constitution, the citizens of this State, either in their own business or in seeking to extend their commerce to other States and to build up our cities by intercourse with our neighbors, to the use of the canals, with all the speed which the enlargement will give, while Canada and Pennsylvania, Vermont and Massachusetts, are, with railroad speed and facilities, running away with the trade legitimately ours. If this was the plain language of the Constitution, legislators could only obey, and courts could not relieve against it. But such is not the language. On the contrary, it will not bear this interpretation, neither can such an intent be spelled out from it. It is also claimed that the sixth section of the seventh article of the Constitution, which prohibits the legislature from selling, leasing or otherwise disposing of any of the canals of the State, and requiring that they shall remain the property of the State and under its management forever, deprives the legislature of the power of doing, or authorizing to be done, that which may lessen the revenue from the canals, or permitting channels of trade to be opened which may divert business from the canals. Had the object of the framers of the Constitution been to secure the

largest amount of tolls and revenue from the canals, we should have found some provision bearing directly upon the tolls, and either inhibiting the legislature from reducing the tolls at all, or enjoining upon it the duty of regulating the tolls so as to secure the greatest amount of revenue. But, so far from this, is the fact that the legislature have uncontrolled discretion over the tolls, and may reduce them to the lowest point, even to a nominal amount, or impose a duty on some articles and permit others to pass free over the canals, as the interests of the State shall dictate. The object of the sixth section was to keep the control and management of the canals in the State, in order that they might be so managed as best to subserve the interests of commerce and the great State and national interests to promote which they were constructed; and not to suffer them to pass into the hands of private monopolists and speculators, or the owners of rival channels and routes of trade, in whose hands they might be employed to destroy, rather than advance, the public good. As we have seen, a restraint upon, or a prohibition of the exercise of, the legislative power, will not be implied in any case, but must be clearly and distinctly expressed in the organic law, before courts will hold an act of the legislature void, as *ultra vires*. Most certainly, there is no reason to infer, in this case, above all others, that it was the intent of the framers of the instrument to deprive the legislature of any of its ordinary and legitimate power to legislate for the advancement of the prosperity of the State, by opening new means and facilities for trade, and new and improved sources of wealth, although the aggregate of canal tolls might be diminished.

I find no provision in the Constitution which, directly or indirectly, expressly or impliedly, forbids the legislature from releasing the tax upon merchandise transported upon the railways. The act of 1851, repealing the laws imposing the tolls upon goods so carried, was, therefore, within the legislative power, and is valid; and the judgment must be affirmed, with costs.

All the judges concurring,

Judgment affirmed.