GEORGE *v.* CONCORD.

The act of Congress approved February 25, 1862, which provides that United States notes shall be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest upon bonds and notes, held to be constitutional and valid.

Said act applies to debts contracted before, as well as subsequent to, the passage of said act.

Said act does not impair or affect the obligation of contracts; but if it did, that would not necessarily render it unconstitutional.

ASSUMPSIT upon a promissory note, given by the city of Concord, dated December 4th, 1861, payable to the plaintiff, on demand, with interest annually.

The defendants plead, that, on the 29th day of January, 1863, they tendered to the plaintiff the amount of said note and interest, to wit, &c., which the plaintiff declined to accept, and they bring the same into court, &c. On this plea issue is joined, and, by agreement of parties, the case is tried by the court.

The authority of the city agents and the due execution of said note being admitted, it was shown by the defendants, that, on the 29th of January, 1863, an agent of the city duly authorized, tendered to the plaintiff the sum of two thousand dollars and the interest on the same from the date of the note to the date of the tender, in such current bills of the United States as are made by act of Congress, a legal tender for the payment of debts, and the plaintiff declined to accept them, objecting that the said bills were not a legal tender, and demanding that said note should be paid in gold or silver coin.

With their plea the defendants brought into court, and deposited with the clerk, the amount tendered in such bills.

And the court held the proof of tender insufficient, and found for the plaintiff.

And thereupon the city of Concord took exception to the holding of said court, and the question of law arising thereon was reserved for decision at the Law Term.

*Minot & Mugridge*, for defendants.

I. The act of Congress making the notes in question legal tender is constitutional. *Meyer* v. *Roosevelt*, Sup. Court of New York, 1863 ; *Hague* v. *Powers*, same court.

II. If there be doubt on that point, the decision of this court not being final, from considerations of public policy, should be in favor of the constitutionality of the act until authoratively determined by the supreme tribunal the court of the United States. *Reynolds* v. *Bank of Indiana*, Am. Law Register, Sept. 1862 ; *Wood* v. *Bullens*, 6 Allen, 516.

*George, Foster & Sanborn*, for plaintiff.

The plaintiff refers to the 8th and 10th sections of the first article, and the 10th section of the amended articles, of the U. S. Constitution ; also to *Reynolds* v. *Bank of Indiana*, Am. Law Register, Sept. 1862, and to the reported argument of Hon. Geo. T. Curtis, and the opinion of Chief Justice Denio, in *Meyer* v. *Roosevelt*, recently published.

SARGENT, J.    The only question in this case is as to the sufficiency of the tender ; but that question depends upon another of vastly more importance than any pecuniary interest that may be involved in the present suit.    This suit is brought upon a promissory note given by the city of Concord to the plaintiff for the payment of $2000, on demand, with interest annually, and dated December 4, 1861.    On the 29th of January 1863, the defendant tendered to the plaintiff the amount of principal and interest due upon said note at that date, in such current bills of the United States as were made by act of Congress a legal tender for the payment of debts, which the plaintiff declined to receive, and thereupon commenced this suit upon the note.    The defendant pleaded such tender and with the plea brought into court and deposited with the clerk the amount of bills so tendered.

The defendant claims that this tender was legal and sufficient to discharge the plaintiff's claim, and he relies upon an act of Congress approved February 25, 1862, subsequent to the date of the note in question but before the tender in this case was made, which act provides that such United States notes shall be lawful money and a legal tender in payment of all debts, public and private, with certain specified exceptions.    The plaintiff claims payment of his note in gold or silver coin, not because this case is one embraced within the exceptions alluded to in the act of Congress, but upon the ground that said act is unconstitu-

tional and void so far at least as relates to the note in question; and that is the question upon which the case must be decided.

The question thus presented is one of great magnitude and of the gravest importance. Its ultimate decision involves the most serious consequences, both public and private. The magnitude of the interests involved in the decision of this question challenges our most careful consideration.

The provision of the act of Congress referred to is as follows:— "That the Secretary of the Treasury is hereby authorized to issue on the credit of the United States one hundred and fifty millions of dollars of United States notes, not bearing interest, payable to bearer at the Treasury of the United States, and of such denomination as he may deem expedient, not less than five dollars each; provided that such notes herein authorized shall be receivable in payment of taxes, interest, duties, debts and demands of every kind due to the United States except duties on imports, and of all claims and demands against the United States of every kind whatsoever, except for interest upon bonds and notes, which shall be paid in coin, and shall also be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid." Ch. 33, sec. 1, *Acts of 37th Congress, 2nd Session.*

This act has been passed by both Houses of Congress after grave deliberation, and has been approved by the Executive, and thus comes to us with all the forms of law, and having the sanction of the two departments of the government which is required by the constitution to give it force and effect as a law. But we are called upon to set aside this act as being in violation of the fundamental law; and it becomes our duty, great as may be the responsibility involved in its performance, to decide, at least, so far as the authority of this court extends, whether or not the Constitution of the United States has been violated by this enactment.

It is to be regretted that this question comes before us under the peculiar circumstances that attend this case. The city of Concord being a party, three of our number, as the court is now constituted, are disqualified to sit, being residents of that city, and, of course, in law pecuniarily interested in the decision of the question involved. We could have desired that a question of this magnitude might have arisen under circumstances such as would have given us the benefit of the learning and experience of those members of the bench who cannot now participate in our deliberations. But it is not for the court to elect how or when or where or what questions of law shall arise for its determination. Our duty in the case being plain and imperative, we are not at liberty, if we would, to shrink from its performance.

One rule to be applied in this case, is fully stated in *Rich* v. *Flanders*, 39 N. H. 312, "that, when called upon to pronounce an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, invalid and void in consequence of its conflicting with some constitutional provision, courts will approach the question with great caution, examine it in every aspect and ponder upon it as long as deliberation and patient attention can throw any new light upon the sub-

ject, and will never decree a statute void unless the nullity and invalidity of the act are placed in their judgment beyond reasonable doubt." *Cooper* v. *Telfair*, 4 Dallas, 14; *Wellington Petitioner*, 16 Pick. 95; *Fletcher* v. *Peck*, 6 Cranch, 128; *Ogden* v. *Saunders*, 12 Wheat. 29.

Before proceeding to examine the specific questions involved in this case, it may be well to examine some of the general provisions of the Constitution of the United States and the powers therein conferred upon the general government and upon Congress as the legislative branch thereof, as these provisions will be found to have a direct bearing upon the questions more directly in issue in this case.

Sec. 2, art. 6, U. S. Constitution, provides that "this Constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States shall be the supreme law of the land and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding." By this provision with others it was intended to secure to the national government absolute sovereignty, and complete supremacy in the exercise of all governmental powers confided to it by that instrument.

This Constitution was adopted by the people, the fountain of sovereign power, for certain definite purposes, and it conferred on that government supreme authority over all the people and all the States so far as was necessary to accomplish those purposes. "The people of the United States, in order to form a more perfect union, establish justice, ensure domestic tranquillity, provide for the common defence, promote the general welfare and secure the blessings of liberty to ourselves and to our posterity," did ordain and establish the same.

When the convention which formed the Constitution, met in 1787, their purpose at first was to revise the articles of confederation which had proved a failure because the confederacy lacked every element of a sovereignty. But after discussing for a time its defects, they were found to be so great, so numerous and so radical that all attempts at revision were abandoned, and the convention, as its first deliberate act after its organization, resolved "that a national government ought to be established consisting of a *Supreme Legislative, Executive, and Judiciary.*" Acting upon this purpose thus definitely expressed and with this sole intent, they formed the Constitution and referred it to the people and not to the States for adoption; and when thus adopted by the people in their sovereign capacity it became the supreme law of the land, and of the whole land, and all the powers exercised under it, whether executive, legislative or judicial, within their appropriate sphere, were to be absolutely sovereign, supreme and paramount.

All legislative powers thereby granted were vested in the Congress, and the powers so granted are enumerated in sec. 8, art. 1, of said Constitution in general terms; the general principles only being stated, so that every grant of power would thus necessarily carry with it all the incidental and implied powers essential to its full exercise and enjoyment; and to prevent any doubt as to the fulness and sufficiency of the

powers granted this clause is added to such general enumeration of powers : "And to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

These views are fully sustained by learned commentators as well as by the authoritative decisions of the Supreme Court of the United States, the final arbiter of that government. Story's Com. on the Constitution, secs. 354, 355, 356, 360.

In *Martin* v. *Hunter,* 1 Wheat. 304, (324,) *Story, J.,* in delivering the opinion of the court said : "The Constitution of the United States was ordained and established not by the States in their sovereign capacity, but emphatically, as the preamble of the Constitution declares, by the people of the United States." *Marshall, C. J.,* in delivering the unanimous opinion of the court, in *McCulloch* v. *Maryland,* 4 Wheat. 416, observed : "From the conventions called to ratify it, the Constitution derives its whole authority. The government proceeds directly from the people, is ordained and established in the name of the people, and is declared to be ordained in order to form a more perfect union, establish justice, ensure domestic tranquillity, and secure the blessings of liberty to themselves and to their posterity. The assent of the States in their sovereign capacity is implied in calling a convention and thus submitting that instrument to the people. But the people were at perfect liberty to accept or reject it and their action was final. It required not the affirmance of, and could not be negatived by, the State governments. The Constitution when thus adopted was a complete obligation and bound the State sovereignties, * * * To the formation of a league, such as was the confederation, the State sovereignties were certainly competent ; but when, in order to form a more perfect union, it was deemed necessary to change this alliance into an effective government possessing great and sovereign powers and acting directly on the people, the necessity of referring it to the people, and of deriving its powers directly from them, was felt and acknowledged by all. The government of the Union, then, is emphatically and truly a government of the people. In form and substance it emanates from them, its powers are granted by them, and are to be exercised directly on them and for their benefit. * * * It is the government of all, and its powers are delegated by all, it represents all, and acts for all. * * * If any one proposition could command the universal consent of mankind we might expect it would be this, that the government of the Union, though limited in its powers, is supreme within its sphere of action. * * * The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason ; the people have in express terms decided it by saying, this Constitution and the laws of the United States, which shall be made in pursuance thereof shall be the supreme law of the land, and by requiring that the members of the State legislatures and the officers of the executive and judicial departments of the States shall take the oath of fidelity to it." The same doctrine was distinctly enunciated by *Taney, C. J.,* in *Ableman* v. *Booth,* 21 How.

506, 516, where he says, "the powers of the general government and of the State, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties acting separately and independently of each other within their respective spheres ; and the sphere of action appropriated to the United States is as far beyond the reach of judicial process issued by a State judge or a State court, as if the line of division was traced by landmarks and monuments visible to the eye."   *Davies, J.,* in delivering the opinion in *Bank* v.   *Van Dyck* and in *Meyer* v. *Roosevelt*, in the New York Court of Appeals in 1863, 13 E. P. Smith, says "the omnipotence of the British Parliament is not more absolute than is the supremacy of the Congress of the United States upon all subjects which are either expressly or impliedly delegated to it."   The same might with equal propriety be said in relation to all and to each of the departments of the general government in the use of powers either expressly or impliedly given to them by the Constitution.

The question of construction as applied to the United States Constitution, though much agitated and often discussed, is no longer an open question, but was long since settled by the Supreme Court of the United States, whose decision is made supreme over every other judicial tribunal in the nation upon questions properly within its jurisdiction.   We are to give to the various provisions of the Constitution a liberal construction, such a construction as will most effectually subserve the great purposes of its formation and best promote the general welfare of the people, who have granted the powers there contained to be exercised for their own highest good.   We should be doing great injustice to the framers of the Constitution and a great wrong to the people who adopted it to secure to themselves and their posterity the blessings of liberty, were we to give to it such a construction as will cripple the government and render it unequal to the objects for which it was formed and instituted.   In *McCulloch* v. *Maryland supra, Marshall, C. J.,* in rendering the opinion of the court, says, that, while on the one hand the government of the United States can claim no powers which are not granted to it by the Constitution, which powers thus granted are either expressly given or given by necessary implication, yet on the other hand this instrument like every other grant is to have a reasonable construction according to the import of its terms, and where a power is expressly given in general terms, it is not to be restricted to particular cases unless that construction grows out of the context expressly or by necessary implication.

Again the same learned Judge, in *Gibbons* v. *Ogden*, 9 Wheat. 187, says :   "This instrument contains an enumeration of powers expressly granted by the people to their government.   It has been said that these powers ought to be construed strictly.   But why ought they to be thus construed ?   Is there one sentence in the Constitution which gives countenance to this rule ?   In the last of the enumerated powers, that which grants expressly the *means* for carrying all others into execution, Congress is authorized 'to make all laws which shall be necessary and proper' for the purpose.   But this limitation on the means which may be

used is not extended to the powers which are conferred; nor is there one sentence in the Constitution which has been pointed out by the gentlemen of the bar, or which we have been able to discern, that prescribes this rule. We do not therefore think ourselves justified in adopting it. What do gentlemen mean by strict construction? If they contend only against that enlarged construction which would extend words beyond their natural and obvious import, we might question the application of the term, but should not controvert the principle. If they contend for that narrow construction which, in support of some theory not to be found in the Constitution, would deny to the government those powers which the words of the grant, as usually understood, import, and which are consistent with the general views and objects of the instrument; for that narrow construction which would cripple the government and render it unequal to the objects for which it is declared to be instituted, and to which the powers given, as fairly understood, render it competent; then we cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the Constitution is to be expounded. *

* * We know of no rule for construing the extent of such powers other than is given by the language of the instrument which confers them, taken in connection with the purposes for which they were conferred." See also Story's Com. on Const. sec. 413; *Newell* v. *People,* 3 Seld. 93; *People* v. *Railroad,* 24 N. Y. 485; *Martin* v. *Hunter,* 1 Wheat. 326; *Hague* v. *Powers,* Supreme Court New York, April 1863.

Our attention is called in the argument of the plaintiff to the tenth amendment to the Constitution as containing a restriction upon the powers of the government of the United States. It is as follows: "The powers not delegated to the United States, nor prohibited by it to the States, are reserved to the States or to the people." The same reservation was contained in the articles of confederation, art. 2, except that the word *expressly* was there placed before the word *delegated.* The omission of this word in the tenth amendment is most significant and shows that no such strict construction was to be applied to the Constitution as had necessarily been applied to the articles of confederation; and that the object in the Constitution was not to interfere with or restrict any of the powers delegated to the United States, whether expressly or by implication.

Upon this point we have also the authoritative decision of the Supreme Court of the United States in *McCulloch* v. *Maryland supra,* where it is said: "But there is no phrase in the instrument (Constitution) which like the articles of confederation exclude incidental or implied powers. Even the tenth amendment, which was formed for the purpose of quieting the excessive jealousies which had been excited, omits the word '*expressly*', and decides only that the powers not delegated to the United States nor prohibited to the States, are reserved to the States or to the people, thus leaving the question, whether the particular power which may become the subject of contest has been delegated to the one government or prohibited to the other, to depend on a fair construction of of the whole instrument. The men who drew and adopted this amend-

ment had experienced the embarrassments resulting from the insertion of this word in the articles of confederation, and probably omitted it to avoid those embarrassments. A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and would scarcely be embraced by the human mind. It would probably never be understood by the public. Its nature therefore requires that only its great outlines should be marked, its important objects designated, and the minor ingredients, which compose those objects, be deduced from the nature of the objects themselves. That this idea was entertained by the framers of the American Constitution is not only to be inferred from the nature of the instrument but from the language. Why else were some of the limitations found in the 9th section of the first article introduced?"

This last question proposed by *Chief Justice Marshall,* is one of great significance. Here are a large number of restrictions defining what Congress or the government shall not do, which prohibitions would be entirely useless and unmeaning, if Congress can only do what it is specifically authorized to do; or if it was not supposed that Congress might sometime have exercised these powers, and properly too, unless such prohibition had been made. So also the first eight amendments to the Constitution are all in restraint of powers which it was supposed could have been exercised by Congress without such prohibitions. None of them are applicable to any of the express powers delegated to Congress, but embrace an enumeration of certain implied powers, which it was assumed Congress might exercise under the general delegation of powers unless specially prohibited from so doing. The omission in sec. 9 of art. 1, and in any of these amendments, of any restraint upon or prohibition to Congress, to legislate upon the subject of what should or should not be a legal tender, possesses great significance and importance. *Bank* v. *Van Dyck supra.* Let this fact be noted that the Constitution contains no prohibition upon Congress from legislating on that subject, and no restriction of its power thus to legislate.

Sec. 10, art. 1 of the U. S. Constitution provides that "no State shall enter into any treaty, alliance, or confederation, grant letters of marque and reprisal, coin money, emit bills of credit, make anything but gold and silver coin a tender in payment of debts, pass any bill of attainder, *ex post facto* law, or laws impairing the obligation of contracts, or grant any title of nobility." Now three of these same powers are, in sec. 9, art. 1, also prohibited to Congress, *viz,* to pass any bill of attainder, or *ex post facto* law, or grant any title of nobility. Two of the powers prohibited to the States in sec. 10, are expressly granted to Congress in sec. 8, art. 1—the power to grant letters of marque and reprisal, and to coin money and regulate the value thereof, &c. Of the other powers which are prohibited to the States but neither specially granted or prohibited to Congress, it has been held that many of them may be exercised by Congress, when necessary or proper to aid in carrying out and enforcing other delegated powers. The States can pass no law impairing the obligation of contracts, but Congress may do it when it be-

comes necessary in order to accomplish any of its delegated powers. So of emitting bills of credit.

There is no power expressly granted in the Constitution, either to Congress or to the States, to make anything a legal tender in payment of debts. But it is implied directly that the States have the power to make gold and silver such tender, by their being prohibited to make anything else a tender. Nor has it ever been doubted that Congress had the power to make laws in relation to tender, and it has constantly exercised that power by unanimous consent. Before the adoption of the Constitution, the States had constantly been in the habit of making their bills of credit a legal tender in the payment of all debts. See *Briscoe* v. *Bank*, 11 Peters, 334, 337. They had regarded that as a right and a power of State sovereignty ; and when a part of the sovereign powers were conferred upon the national government for general purposes, and those not thus conferred directly or by implication, were retained by the States or the people, was this sovereign power understood to be conferred upon the general government? It was not reserved to the States, for it is expressly prohibited to them. It was not reserved to the people, for there was no way provided for them to exercise it. This power *is not specifically conferred upon, nor is it denied to,* Congress, yet this power is an attribute of sovereignty, and was exercised by England in 1833 making the notes of the Bank of England a legal tender for private debts in every part of the British Empire. 3 and 4 William 4, ch. 98, sec. 6. France has done substantially the same thing in times of war. No power to make anything a tender was conferred by the Constitution upon Congress nor upon the States, yet both have exercised the power. The States are prohibited from making anything but gold and silver a tender. Congress was not thus prohibited.

But let us now see what are some of the powers expressly granted to Congress in sec. 8, art. 1, of the Constitution which need to be here referred to :

(1) To levy and collect taxes, duties, imposts and excises ; (2) to pay the public debts ; (3) to provide for the common defence and general welfare ; (4) to borrow money on the credit of the United States ; (5) to regulate commerce, &c ; (6) to coin money and regulate the value thereof &c. ; (7) to punish counterfeiters of the U. S. securities and coin ; (8) to declare war ; (9) to raise and support armies ; (10) to provide and maintain a navy ; (11) to suppress insurrections and repel invasions ; (12) to enact all laws *necessary to the execution of these powers,* and of all *other* powers vested in the government, or any department or officer thereof, by the Constitution.

A question at once arises here as to the degree of necessity that must exist in order to warrant Congress to make any law to carry into effect any of these great substantial powers before enumerated, and who is to be the judge of the existence of that necessity. These points have long since been settled by the Supreme Court of the United States, so that we cannot remain in doubt on them. In *McCulloch* v. *Maryland,* be-

fore cited, it is held that the word *necessary* in this connection does not mean *absolutely indispensable*, but simply means *needful, appropriate, fit, adapted,* and nothing more was required by it than that the measure should be adapted to carry into effect some specific power of Congress. *Marshall, C. J.,* delivering the opinion, says : "When the law is not prohibited and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department and tread on legislative ground. The government, which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means. * * * If, then, the law in question be not prohibited in the Constitution of the United States and if it was in any degree needful, fit, adapted and appropriate to the end of carrying out any of the powers heretofore enumerated as expressly delegated to Congress, then the power may be properly exercised and the court will not inquire whether the means used were the *best* adapted, and the *most* proper, of any that might have been used by Congress. That was a matter entirely *within the discretion of Congress.*" And, in *United States* v. *Fisher,* 2 Cranch, 358, *Marshall, C. J.,* in the opinion, says : "Congress must possess the choice of means, and must be empowered to use any means which are in fact *conducive* to the exercise of a power granted by the Constitution. The government is to pay the debt of the nation and must be authorized to use the means which appear to itself most eligible to effect that object."

One other point should be alluded to here. It is not necessary that the act in question should be so connected with any *one* of the express powers granted to Congress, as to become necessary and proper in connection with the exercise of that power *alone.* It is very justly stated by *Denio, C. J.,* in *Bank* v. *Van Dyck supra,* to which opinion we have been referred by the plaintiff : "I concede that it is not incumbent upon those who argue for the validity of the legal tender clause, to select any one express power and to maintain that the provision is a legitimate execution of that power. They may group together any number of these grants of legislative authority, and if the right to enact that provision is fairly deducible from any or all of them, their position is established."

It is also admitted on all hands that the court may properly take judicial notice of the present state and condition of the country and its condition at the time the law in question was passed.

Then, as now, a civil war existed, caused by the insurrection and rebellion of the Southern States, of such proportions and magnitude as to threaten the destruction of the national government. The Supreme Court of the United States has already announced its judgment of the perils which overhung the people and the government, by declaring on our judicial records that we were in the crisis of "the greatest civil war known in the history of the human race." *The Prize Cases,* 2 Am. Law Reg. N. S. 339.

The exigency demanded the prompt and efficient exercise of all the im-

portant and vital functions of that government in maintaining and preserving itself. Armies were to be raised and supported, navies provided and equipped. It was not only within the express powers conferred upon, but it was the imperative duty of, Congress, to provide the ways and means of quelling the widely extended insurrection, and that body would have been recreant to the important trusts confided to it had it failed to employ all constitutional means for the attainment of that end. Several acts of Congress have been passed authorizing the issuing of bonds and treasury notes, bearing interest, and United States notes not bearing interest, which last should be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest on the public debt. These several acts may as well be considered together. If one can be sustained, they all can ; if one fails, they all fail. They are *pari materia* and must stand or fall together.

The expenses of the war, which soon reached a million of dollars per day, kept on increasing, until presently two millions of dollars a day must be paid out by the government for the ordinary disbursements of war. The government could not borrow abroad from nations who were jealous of its power and who looked and longed for its destruction. It could not borrow at home in gold and silver, unless it were by forced loans, which would at once drain the life blood of commerce, and involve the country in bankruptcy ; and, besides, there was not gold and silver enough in the whole country, north and south, could the government have appropriated it all, to have paid the national expenses for a single year of the war. At the commencement of the fiscal year, July 1, 1861, the entire aggregate amount of gold and silver coin in the whole country, north and south, so far as it could be deduced from reliable statistics was something less than $250,000,000. See Hunt's Merchant's Mag, Vol. 48, p. 215, March 1863.

This was much less than the country needed to borrow for immediate use, and, hence, on the 25th February, 1862, the act here in question was passed, to provide means for the payment to the army and navy of the arrears then due, by issuing $150,000,000 United States legal tender notes, in addition to all public loans previously made or authorized. Congress assembled on the first of December, 1862, and the President then communicated the fact, that, on the fiscal year ending on the 30th of June, 1862—the year in which the law in question was passed—the disbursements of the government had been over $570,000,000, of which nearly $530,000,000 had been borrowed on the credit of the government ; thus showing, that, during the first year of the war, when the expenses were less than in any other year of its duration, the government was obliged to borrow upon its own credit more than twice as much money as the whole amount of all the gold and silver coin in the country at the commencement of the war.

On the 3d of March, 1863, an act was passed by Congress authorizing the government to borrow and raise upon bonds, and treasury notes, and United States legal tender notes, the sum of $1,600,000,-000, which was estimated as necessary for the exigencies of that year

alone.   The effect of making some portion of these loans consist of legal tender notes was to keep the government loan at par, whereas without this provision, there must almost of necessity have been such a depreciation of government securities as to have involved the nation in entire, hopeless bankruptcy, or forced it to repudiate.

The amount thus needed could not be raised by taxation. The government might tax, but the people could not pay, because, if the government had to pay specie, it must exact specie, not only as duties on imports but in payment of all public taxes; and, although it could sacrifice private property by seizure and forced sales, yet there was not gold and silver coin enough on the continent to buy what the government would be compelled to sell.

One-third of the nation was using against the other two-thirds, the very power, the existence of which for the destruction of the government was recognized and defended by those who denied its existence for the purpose of government protection.   If the power to enact these laws be incident to the necessity, it existed beyond question, for the necessity was undeniable.

We may now inquire whether Congress has the power to authorize the issue of treasury notes to circulate as money, and make them a tender in payment of public debts, due to and from the general government?

This right has been questioned, but seems now to be settled by great weight of authority.   To be sure, the original section in the Constitution, which provided that Congress should have power "to borrow money and emit bills on the credit of the United States," was amended by striking out the words, "and emit bills."   The power to emit bills of credit is not therefore conferred upon Congress as an express power, neither is it prohibited, and it has been held that this power was granted as an incidental or implied power.   The power has been exercised so often by the general government under so many different administrations that we may safely assume that it may be properly done.

The treasury notes authorized by the acts of 1812–13 and 14 bore five per cent. interest.   By the act of 1815 notes of the denomination of $100 and less were authorized, transferable by delivery and without interest.   It is said that bills under this act were issued of as small denomination as $10.   By the act of 1837, notes were authorized as small as fifty dollars.   They were to be issued at such interest as the Secretary of the Treasury might direct and were in fact issued at a mere nominal interest of one, two and three per cent.  This act, with the same provisions, making notes transferable by delivery and payable to bearer, was continued by acts in 1838 and the subsequent years, to 1847. This latter class of notes were obviously issued for circulation among the people, were receivable for all government dues, and were to be paid to the public creditors as money.   So that, while States are prohibited from issuing bills of credit, the general government has freely exercised that power.

In *Thorndike* v. *United States*, 2 Mason, 18, *Story, J.*, said: "By the statutes of the United States, under which treasury notes have

been from time to time issued, it is enacted that such notes shall be receivable in payment to the United States for dues, taxes and sales of public lands to the full amount of the principal and interest accruing due on such notes.   It follows, of course, that they are a legal tender in payment of debts of this nature due to the United States, and, by the very tenor of the acts, public officers are bound to receive them."

This question is not in controversy in this case, because *Denio, C. J.,* in his opinion in *Bank* v. *Van Dyck supra,* and Mr. Curtis, who in that case argued against the constitutionality of the act now in question, to both of which we are referred by plaintiff's counsel, as authority, both admit that Congress have the power, and may properly exercise it, as they have so frequently done, to the extent already specified.

We are now prepared to consider the main, the material, question, in this case, which is.   Can Congress properly make such notes lawful money and a legal tender in the payment of all debts, public and private?

It would seem, that, in the light of the legal and constitutional principles which we have examined and which have long been settled by the highest judicial authority, and of the admitted facts in the case to which we have alluded, there could be but one answer to this inquiry.   We have seen that Congress is not prohibited from making anything a legal tender, though the States are thus prohibited from using anything but gold and silver for that purpose.   No power is expressly conferred on Congress to make anything a legal tender for the payment of any debt; but it is a power which it has ever exercised by common consent without question.

As Congress is not prohibited from making treasury notes a legal tender, if it becomes necessary to do so in connection with the war-making power, the raising and supporting of vast armies, equipping and maintaining a navy such as is needed in the present emergency; the suppressing of the present gigantic insurrection, providing for calling forth the militia to execute the laws of the Union; if it is necessary to do so in order to borrow on the credit of the government the immense sums of money needed to carry on the present war; if it is necessary in order to pay the debts of the Union and do all other things necessary and proper to provide for the common defence and promote the general welfare; if, in order to carry out and exercise any or all of these express grants, or any or all other power or powers expressly given to the government of the United States or any department or officer thereof, the exercise of the power in question became needful or was found appropriate, then we have the express warrant in the Constitution of the United States for its exercise.

If, in meeting the expenses of this war, requiring a sum each year, more than twice as large as the whole amount of specie in the United States at the commencement of the war, and requiring, in the aggregate, more, probably, than the whole amount of gold and silver coin in the world at any date—if in order to raise or borrow to this extent, or pay debts contracted to that amount, it was found necessary to make some

of these notes a legal tender for the payment of all debts, it might constitutionally be done. It seems to us undeniable that such action had a direct tendency to sustain the government credit, to facilitate the borrowing of money, and to aid in paying the debts of the Union. It was one of the means which Congress might use in its discretion, and, for aught we can see, one of the most effectual means which it could have used for carrying out and exercising the express powers granted it of borrowing money on the credit of the United States, for all the various purposes for which it has been needed during the present war, and for paying the debts of the Union, incurred in the prosecution of the war, and in providing for the public defence and the general welfare. The question we are discussing was substantially answered by *Marshall, C. J.*, in *United States* v. *Fisher supra*, more than sixty years ago, when he said : "The government is to pay the debt of the nation and must be authorized to use the means which appear to itself most eligible to effect that object."

But it may be objected that the act in question, making treasury notes a legal tender, impairs the obligation of contracts. If we were to admit that it does so, still it would be no objection to the law. The States are prohibited by the Constitution of the United States from passing laws thus to impair the obligation of contracts, but Congress is not; and whenever that body, in the exercise of any delegated authority, whether express or implied, shall pass a law impairing the obligation of contracts, the individual must suffer, because in all such cases the general government is sovereign and supreme, and the State laws and individual interests must yield to the general good.

This is expressly held in *Evans* v. *Eaton*, 1 Peters, C. C. R. 322, where *Washington, J.*, in delivering the opinion, says : "Congress, in the exercise of its delegated powers, may unquestionably pass laws the effect of which would undoubtedly be to impair or affect the validity of contracts."

An act declaring war would annul a vast amount of contracts based on a contemplated peace, yet the power to declare war by Congress is undoubted, and the effect which its exercise would have on existing contracts could in no manner circumscribe or affect the exercise of the power.

So the embargo act of Jefferson's administration injured and destroyed numerous contracts entered into upon the assumption that commercial relations were to continue ; but these acts were adjudged to be constitutional in that case on the ground that the power to make them was incidental to and a corollary from the right to regulate commerce. So the bankrupt act of 1841 impaired the obligation of contracts in the most decided manner, yet it was held constitutional under the express power given to Congress over that subject. *In re Klein*, 1 Howard, S. C. R. 277 ; *Kunzler* v. *Kohaus*, 5 Hill, 325.

But the law making treasury notes a legal tender does not impair the obligation of contracts. This was a contract to pay a certain sum of money. All such contracts are answered and performed fully and legally if paid to the full amount, in currency which is lawful money or

legal tender at the time payment becomes due or is demanded. This was early settled in the Supreme Court of the United States in *Faw* v. *Marsteller*, 2 Cranch, 20; *Dewmans* v. *Dewmans Exrs.*, 1 Wash. Va. Rep. 26, where the bond was payable in Virginia currency which was paper money, and a legal tender at the time the bond was given. A tender of Virginia currency was pleaded, but it was held insufficient, because, before the time of tender, such currency had ceased to be legal tender. The tender must be in money, current at the time of the tender; whether it were so or not at the date of the contract is immaterial.

*Pong* v. *De Lindsey*, Dyer, 82, a., was debt on bond for payment of £24 sterling. Plea of tender that at the time of payment certain money was current in England in the place of sterlings called pollards, *viz*, two pollards for one sterling, and that on, &c., at, &c., a tender of pollards was made which was held good, and the note of the case is, that, if at the time appointed for payment, a base money is current in lieu of sterling, tender, at the time and place, of that base money is good and the creditor can recover no other.

Queen Elizabeth caused some mixed money to be coined at the mint and sent it to Ireland with a proclamation that it be current there at a certain value, and by the same proclamation a stop was put to the currency of all other coins in that kingdom. It was holden that a tender made in this money according to its current value was good in discharge of all contracts payable in money.

If the money which has been tendered become, after a refusal to accept thereof, current at a less value than it was current at when the tender was made, the party who refused to accept it must bear the loss, if when tendered it was lawful money.

By a law of Congress passed in 1837, it was provided, that, of the silver coins, the half dollar should be of the weight of 206 1-4 grains, and the quarter dollar, dime, and half dime in that proportion. But, by act of 1853, it was provided that the weight of the half dollar or piece of fifty cents shall be 192 grains, and the quarter, dime, and half dime in the same proportion, and these last coins were made legal tender for all sums not exceeding five dollars. Brightly's Dig. Coinage, p. 152, secs. 4, 13, 14, 16. After April 1, 1853, therefore, the man who received his debt in coin of these denominations received 14 1-4 grains less of silver to every fifty cents, or 28 1-2 grains less to the dollar of silver than he would have been entitled to before, being a deduction of nearly one-fifteenth part of the whole value. But this baser coin being made a tender must be received in payment of all debts, old or new, according to the terms of the act, and that too without impairing the obligation of any contract.

There is no doubt of the perfect right of Congress to make this change. It is one of the express powers given to that body by the Constitution, to coin money and regulate the value thereof, and that without any limitation or restriction whatever. On that subject Congress has as supreme and unlimited powers as any sovereignty in the world. If the words "to coin money" should be held to be confined to making money out of

metals by impressing upon them the devices and stamp of the government, we need not inquire whether Congress might not substitute iron, the money which Lycurgus prescribed for Sparta, for gold and silver, if it chose, because there could be no occasion for so doing, as their power "to regulate the value" of money is also supreme and unlimited.

The authority, which has already been exercised by Congress, of debasing the coin, or making a less quantity of silver than before worth a given sum, implies the right to go further and say that the same quantity of silver, which has heretofore been worth a dollar, shall be worth ten dollars or a hundred, and that an eagle shall be worth a hundred dollars or a thousand.   There is no doubt, there can be none, that the Constitution gives Congress the express power to do this.   That power is unlimited, absolute.   Had Congress, instead of making treasury notes lawful tender, seen fit to take all the gold and silver within its reach, and have multiplied it by 1000, or a still larger number if necessary, or in other words have added 999 parts of alloy to one of silver or gold, and then made this debased coin legal tender, as they clearly had the power to do under the Constitution, they might in that way have supplied the necessary amount of money for the wants of the government during the last four years, and in such case this plaintiff must have received such tender in full discharge of his debt, nor could he then have complained that such action of Congress had impaired the obligation of his contract.

Every man when he makes a contract understands, that, though the States cannot make anything but gold and silver a tender in payment or satisfaction of such contract, yet that Congress is not prohibited from doing so, and that while the States have no power to regulate or change the value of gold and silver coin, that power has been expressly delegated to Congress, and that this power is without limitation or restriction. All that any man is bound to do by any contract for the payment of money, is to pay the sum specified in such contract, in such money or currency as shall be lawful money and a legal tender when and where the contract becomes due or is made payable, or when payment of the same is demanded, and hence any change in the value or the kind of the currency would not impair or affect the obligation of his contract.   The contract is to pay in lawful money, and where lawful money is paid or tendered that discharges the obligation and performs the contract legally and fully.   Story Prom. Notes, sec. 390 and note.

But Congress have, as we think, shown their wisdom in making treasury notes a legal tender, and in pledging for their final redemption and payment all the wealth and resources of the country, to be paid dollar for dollar in the future, rather than by debasing the currency and by compelling the people to receive, in payment of their debts, a coin of no intrinsic value, but which would still be lawful money, simply because it would bear Cæsar's image and superscription, without any promise that it would ever be redeemed in anything better, without any pledge of national faith or the national resources for its ultimate redemption in anything of intrinsic value.

Congress have the right and the power, in case of necessity, to do one

of these, by express grant from the people in the Constitution, while we hold that they possess the other, as an implied power incident to their express powers, to declare war, to raise and support fleets and armies, to suppress insurrection and repel invasion, to borrow money on the credit of the government, and pay the debts of the nation. We think, that, by so holding, we avoid a much greater evil than we risk, and we also think that Congress, in the course they have taken in this respect, instead of debasing the specie currency, have been doing what was necessary and proper to provide for the common defence and promote the general welfare.

This question has been fully considered by the Supreme Court of New York in *Hague* v. *Powers supra,* where it was held that the provision of the law of 1862 making treasury notes a legal tender was constitutional and valid and the conclusions of the court are stated by *E. D. Smith, P. J.,* as follows :

1st. "That the issue of treasury notes is warranted by the Constitution of the United States, at all times, in the discretion of Congress, as a medium for the payment of taxes, under the taxing power, and as a form of security to the public creditors for money borrowed, under the power "to borrow money."

2nd. That the form, size and denomination of such notes, and the making of them in the similitude of bank bills, and payable to bearer, so as to be transferable by delivery and go into circulation as money, are matters entirely within the discretion of the legislature ; and so far as relates to their voluntary receipt and circulation by the public, they stand upon precisely the same footing as bills of exchange and promissory notes issued by private individuals or corporations, and rest exclusively upon their credit as merchantable securities.

3d. That the power to make such notes a substitute for money and legal tender in payment of debts, may rest as an incidental or implied power upon the power to "to impose taxes, duties and imposts," and upon the power "to borrow money", and also upon the power given to Congress "to pass such laws as shall be necessary and proper to carry into effect the other specified powers."

4th. That, in connection with these powers, the powers to declare war, raise and support armies, to provide and support a navy, to suppress insurrection and repel invasion, being great governmental and sovereign powers, include and imply a grant of all the means necessary to the end of the powers granted ; and that money being an indispensable agent, and necessary to carry such powers into effect, the power is implied to command, obtain and secure it by any practicable means known or practised among civilized nations ; and that the issue of treasury notes, making them a legal tender in payment of debts, is a proper and lawful means to that end, a process of borrowing money from the people, or making from them a forced loan to meet the government necessities, and is entirely within the legitimate power of Congress as the sovereign authority of the nation.

It follows from these premises that the act in question was fully war-

'ranted by the express and implied power given to Congress, and was and is a measure entirely within the discretion of the national legislature, and with which the judiciary has no rightful authority to interfere."

The same question was carried to the court of appeals of New York in *Bank* v. *Van Dyck*, and in *Meyer* v. *Roosevelt supra*, where the the constitutionality of the law in question was sustained by the court of final resort in that State, two of the eight Judges only dissenting.

We have examined the opinion of *Perkins, J.*, in *Reynolds* v. *The Bank of Indiana*, Am. Law Reg. Vol. 1, N. S. 669, in which he concludes that Congress has not the constitutional power to declare paper money a legal tender. He seems to base this conclusion mainly upon the ground that the law must rest upon and be incidental to the power of Congress to regulate commerce, and that for the regulation of commerce the law was not necessary. We might admit his premises and it would not affect our position, and yet perhaps no law of Congress has done more towards facilitating commerce between the different States than that which we are now considering. But it is not necessary to make that an issue here.

But the court of Indiana still held the law to be constitutional, and for the following reason as stated by *Perkins, J.:* "Influenced, then, by deference to the action of the federal government, by the rule that all doubts must be resolved in favor of the law, * * * by the exigencies of the times, by the consideration of the local injury, temporarily, to our State that would follow a different decision, and the fact that the question can only be decided finally by the Supreme Court of the United States, we hold that the act of Congress making treasury notes a legal tender is within the Constitution and valid. Such will be the ruling of this court till the Federal court shall determine the question otherwise."

The court in that case found the same difficulty that *Denio, C. J.*, did in his dissenting opinion in *Bank* v. *Van Dyck supra*, for he there says at the close : "I shall be well satisfied if a majority of my brethren and the federal court in which our decision will ultimately be reviewed, can reconcile the legislation which the defendant challenges, with a reasonable interpretation of the Constitution of the United States. It is not to be denied that it constitutes a part of a plan of public finance, which, whether wisely organized or not, it is extremely important in the present crisis to maintain if it can possibly be done. If my sense of duty would allow me to decide the case as I should wish the law under the circumstances of this moment, temporarily to be, I would unite in a judgment which would establish the validity of these legal tender notes ; for the preservation of the Federal Union, which is said to be involved, is the most ardent, I may say, passionate, desire of my heart, and no one, I think, can honestly pretend that this can be accomplished except by the vigorous employment of the armed force of the nation. To that purpose the realization and expenditure of immense pecuniary resources are plainly indispensable. No man can have a stronger sense of

the absolute causlessness, nay, the utter wickedness of the insurrection than that which I entertain, or of the duty of every citizen, whether in public office or a private station, to yield to the constituted authorities, upon all questions of policy or expediency, not only implicit obedience, but a sincere and generous confidence and co-operation."

In *Wood* v. *Bullens*, 6 Allen, 516, the Supreme Court of Massachusetts held that the plaintiff in an action on a promissory note payable on demand in specie, can only recover judgment for the amount of the face of the note with interest thereon, although he offers to prove that at the time when payment of the note was demanded specie was worth a premium above par; and in the District Court of Philadelphia, Pa., in *Schoenberger* v. *Watts*, the same question was decided in the same way, though the case was there stronger for the plaintiff than in *Wood* v. *Bullens*. Am. Law Reg. Vol. 1, N. S. 553. The same question has more recently been settled in the same way in the Supreme Court of Pennsylvania, in *Schollenberger* v. *Brinton*, Am. Law Reg. Vol. 3, N. S. 591.

The constitutionality of the law here in question has been sustained by the Supreme Court of Iowa, *Hintrager* v. *Bates*, Dec. Term, 1864, 17, Iowa Rep., and also by the Supreme Court of California in *Lick* v. *Faulkner*, July Term 1864; and the Supreme Court of the United States has decided, not only that Congress, under the power to borrow money, has the power to provide by law that the government bonds and securities shall be exempt from taxation by State laws, though held as property by the citizens of the several States, but that they are thus exempt without such express provision. If this immunity can be granted by Congress to the stocks and securities issued by the United States, under the power to borrow money, it is difficult for us to perceive why Congress may not under the same power make the treasury notes issued for the same purpose, a lawful tender, if by so doing a means would be provided for the more readily accomplishing and making effectual the expressly delegated power. *Judge Denio,* in his opinion *supra,* acknowledges the analogy that exists between the principle of that case and the one involved in our present inquiry. We think there are much stronger reasons for making treasury notes a legal tender than there were for exempting them from taxation.

We have thus found other grounds on which to base our decision, which seem to us satisfactory, without inquiring whether it might not be based properly on the ground that the measure in question was an imperative governmental necessity, without which both the government and the people would have been involved in disaster and universal financial ruin, and without which the national existence might have been sacrificed before this monster insurrection—this *"monstrum ingens, cui lumen ademptum"*—which now stands forth before the world as the embodiment and personification of injustice and of wrong, of barbarity, slavery and treason; in fact, of every villainy and of every crime.

*Judgment for defendant.*