William D. McFeaters, Appellant, *v.* A. S. Pattison, Executor of James McFeaters, deceased.

*Contract—Parent and child—Services—Evidence.*

Where a written contract between a father and a son for services of the latter provides that the compensation for the services shall be reasonable, but does not fix the rate, the father is bound by the obligation, and the question of the rate of compensation is for the jury.

It is not reversible error for a trial judge to comment unfavorably, but, in general terms, upon contracts for services between parents and children.

Where there is no written contract between a father and son for services of the latter, loose declarations of the father to the effect that the son should be paid are inadmissible to establish a definite contract.

Argued Oct. 20, 1898. Appeal, No. 168, Oct. T., 1898, by plaintiff, from judgment of C. P. Indiana Co., March. T., 1897, No. 384, on verdict for plaintiff, for less than his claim. Before GREEN, WILLIAMS, MITCHELL, DEAN and FELL, JJ. Affirmed.

Assumpsit for services. Before HARRY WHITE, P. J.

At the trial it appeared that on August 4, 1893, James McFeaters entered into a written agreement with Wm. D. McFeaters: "That his son, William D. McFeaters, shall have a reasonable recompense in the way of pay for the said James McFeaters, his father's boarding and care attention during the time that he may be and stay with him, the said W. D. McFeaters, and that such pay or recompense shall not be payable during the life of said James McFeaters past his pleasure, or as long as he stays with said W. D. McFeaters. Said pay or recompense to commence at the time that the said James McFeaters went to reside with the said W. D. McFeaters, and end at his decease, or any time that he may leave the residence of the said William D. McFeaters, to remain permanently away."

The plaintiff claimed for services under this agreement and also for services not covered by the written agreement.

In reference to the services not covered by the written contract, Mrs. Lizzie Clark, a witness for plaintiff, testified as follows:

"Q. State whether you heard your grandfather say anything about paying your father for the attention that he gave him while he was at Blacklick."

Objected to by defendant that the witness is incompetent to testify to anything occurring in the lifetime of James McFeaters; because she is a daughter of plaintiff and this account is charged as services rendered by himself and family, at his house.

By the Court: A child is a competent witness; objection goes to the credibility. Objection overruled.

"A. Yes, sir.  Q. What did he say, Mrs. Clark?  A. He
said he would pay him and pay him well for what he had done.
Q. When was this that he said this?  A. When he lived in
Blacklick.  Q. That is, before he went over to your father's?
A. Yes, sir; and he said it after he moved over.  Q. Who was
present when he said this to your father?  A. My mother was
present and one of my sisters.  Q. State whether you were
there when he was sick after his wife's death?  A. Yes,
sir.  Q. Was she your grandmother?  A. Step-grandmother.
Q. How long was he sick after her death.  A. Why he was
sick for, wasn't well when he moved over to our place.  Q. When
he was at Blacklick, how long was he sick that time?  A. He
was there a month.  Q. When did your grandmother die?
A. On the third of March, 1891.  Q. What time did your
grandfather come over to your place?  A. First day of April,
1891.  Q. State whether you were there all the time from the
time of her death up until he moved over there.  A. I wasn't
there all the time; I was there frequently, though.  Q. Who
waited on him during this sickness?  A. My father and my-
self."

Defendant objected for the reason that no such contract had
been proved between the deceased and the plaintiff as would
entitle the plaintiff to recover.

By the Court: This is prior to the date of this article?

Mr. Cunningham, of counsel, for plaintiff: Yes, sir.

By the Court: There is not enough shown to make it com-
petent.  The testimony thus far is not sufficient.

"Q. How did he come to say this to him, Mrs. Clark?  A. We
were talking about his keeping, about us doing work for him.
Q. What did he say in regard to taking care of him; how did
he come to say he would pay him?  A. Why we were doing
the work for him.  Q. What did he say?  A. He said he would
pay us and pay us well.  Q. What time was that after he got
sick; I mean as to the time he went there, the time of your
grandmother's death did he say this?  A. It was after her
death.  Q. How long after her death?  A. A couple of weeks
after.  Q. Who of the family were there, I mean which mem-
bers of your family?  A. My father and mother and myself.
Q. Was he confined to bed?  A. No, sir.  Q. Was he confined
to bed all the time?  A. He was confined to bed several days.

Q. State whether he had any doctor or not. A. No. Q. Was there no doctor attending him at that time? A. No, sir."

Mr. Cunningham: We propose now to call 'Squire Pierce to show—

By the Court: This is not clear and satisfactory testimony. Objection sustained and a bill sealed to the plaintiff.

J. K. Pierce recalled, examined on the part of the plaintiff by Mr. Cunningham, testifies as follows:

Mr. Cunningham: We now propose to prove by the witness on the stand, 'Squire Pierce, the character of the services rendered by William D. McFeaters to his father at Blacklick, and the value of those services.

Mr. Taylor, of counsel, for defendant: That is objected to for the reason that no contract has been proved between the deceased and Wm. D. McFeaters such as would entitle him to recover.

By the Court: This is a suit by a son against a father for alleged attention and services in rendering aid. In the absence of a contract, there cannot be a recovery for such services. The evidence thus far has not come up to the standard, as we regard it, under the law, and therefore evidence prior to the date specified in the written contract, August 4, 1893, is excluded for the present. Objection sustained and a bill sealed to the plaintiff. [6]

The court charged in part as follows:

[Very high authority declares that the most learned doubteth most. This aphorism, we may say, was declared by a most eminent judge and lawyer, and is the natural inclination of a cultured legal mind to accept a reasonable cause for a legal conclusion. This doubt may, then, be said to arise among those dealing with the law about the divinity of the family relation, when they meet so often the unseemly wrangles and disputes among members of the same family, among those, indeed, who come from the loins of the same parents, who were nursed in infancy and nourished by the care, labor, attention and love, we may say, of common parents. It would be well if, when the grave covers all that is mortal of the parents, the disputes and wrangles among the children for the pittance of the material estate the parent leaves behind, were ended; we say, it would

be well if, when the grave covers the parent, the wrangles and disputes of children over his or her accumulations would be forgotten in the common distress that a dear parent has been lost. That this is not so is discouraging, indeed, to the parent when he is thinking and laboring and saving his accumulations and the results of his industry so that when he is gone his children may have a fair start in life and not be dependent upon the cold charity of the world. We say it is discouraging for a parent to labor and accumulate and make efforts to do good so that his children may have profit when he is gone from them, to think that they will so soon forget the reciprocal duties of the great relation of parent and child and get into unseemly wrangles in our courts. Such thoughts are suggested from this class of cases, when we think of the young parents, their tender love and affection for their children, by industry and prudence accumulating property, passing through the morning and the vigor of life to dependent old age, the hand of affliction comes to the parents and they are helpless, and these little children that have been the subject of their care grown to be men and women are the natural dependence of the parents who are thus afflicted. Oh, it is a solemn and unpleasant thing to think, after you are dead or in your affliction, these children that you have so tenderly raised will begrudge you those attentions which the afflictions of age bring upon you. We say, it weakens our confidence in the divinity of human nature when we see these things, and we deprecate them. We could only wish they could be kept out of our courts. Higher authority than we has said this, and, hence, the law says that no child shall recover for services rendered to the father unless a special contract to pay for such services has been made and proved. Now, that is the law. You have heard it discussed, and we have made these general remarks to indicate briefly the reason of it.

A learned judge, away back, says: "Unless an express contract can be shown there can be no precedent more dangerous than to permit a son to succeed in an attempt to avail himself of an account trumped up for the purpose of getting an undue share of the estate at the expense of the other heirs. When a son continues with a father after age, and it is usually done with a view to provision by will, if disappointed in, perhaps, his reasonable expectations, we cannot permit him to turn around and

attempt to retrieve his fortunes by resorting to an account on a quantum meruit for services rendered the father in his lifetime." That has been reiterated again and again. Judge AGNEW says, in Leidig v. Coover, 47 Pa. 534, that "the declarations of a parent to compensate a child may admit the filial devotion and real work of the child and the profit he derives from the services. They may reach further and disclose his own sense of obligation and his settled purpose to compensate. But all this is insufficient to raise a promise. Without a contract expressly made for wages, proved by clear, distinct and satisfactory evidence, there cannot be a recovery." The law, in that respect, is predicated upon that natural feeling that is presumed to exist between father and son, son and father, or children and parents. Hence, to allow services rendered by one to the other to be recovered for in cold dollars and cents, an express contract must be proved. Now, it is different between strangers, because when one stranger renders service to another the law implies a contract and the person rendering the service is to be paid what the services are shown to be reasonably worth. But with a parent and child, we say, there must be an express contract. We have made this plain to you so that you will understand the reason why we were so exacting about a written contract in the matter.] [1]

There is no trouble here on that subject, because there is a written contract between the parties, and the only matter for you to determine is, what should be paid for the services rendered by the son, the plaintiff here, to the deceased father in pursuance of this written contract? That is the only question; and it is well for you to recall, when you are considering what shall be the rate of compensation, what were the relations between these parties, that it was not between strangers, but it was between a son and a father. A son is entitled to just such compensation as comes within the purview of the expressions of the written contract. [But in computing that, reference should be had to the relative position of the parties, the fact that they were parent and child. In arriving at this compensation, we think that should be borne in mind, not as a matter of charity alone, but as an element entering into the quantity and the nature of the services which are claimed for here.

Look at this as a fair business proposition; recalling the fact, also, that this was father and son.] [2]

The expression is this, that James McFeaters "does enter into this contract and agrees that his son, William D. McFeaters, shall have a reasonable recompense in the way of pay for the said James McFeaters's, his father's, boarding and care and attention during the time that he may be and stay with him, the said William D. McFeaters." Now, then, the expression is "boarding, care, attention." There is no conjunction there, but that is understood. The word "and" is not here, but the words "care, attention," and that such pay or recompense shall not be payable during the life of the said James McFeaters past his pleasure or as long as he stays with the said Wm. D. McFeaters. Said pay or recompense to commence at the time that the said James McFeaters went to reside with the said William D. McFeaters and end at his decease or at any time he may leave the residence of William D. McFeaters to remain permanently away."

[Now, it is a safe rule to observe this, in fixing an amount of money that is not specified in a contract, what was in the mind of the parties to that contract at the time it was made; that would be a reasonable compensation in case there was a breach of it, or in case a suit had to be brought to compensate the party under the contract. In plain language, it is a fair thing to discover from all the testimony and the surroundings what was in the mind of James McFeaters and what was in the mind of William D. McFeaters at the time they made that contract of what would be a reasonable compensation for this boarding and care and attention; and, if you can discover it, that is a fair measure of compensation. It is not a question, necessarily, for you to think what it ought to be, what you would require; but, what was in the mind of those parties at the time they made this contract as far as you can discover it.] What was in the minds of these parties when they made this contract? that was a reasonable compensation, if you can discover it from the testimony. What is such a reasonable compensation as was in the contemplation of the parties when this agreement was made? [3]

Verdict and judgment for plaintiff for $122.54, which was less than his claim. Plaintiff appealed.

*Errors assigned* were (1–3) above instructions, quoting them; (6) ruling on evidence, quoting the bill of exceptions.

*Samuel Cunningham,* of *Cunningham & Fisher,* for appellant.— In Heydrick v. Hutchinson, 165 Pa. 208, it is held that a charge whose tendency as a whole is to belittle and prejudice one side, and which is not in expression and tone a judicial presentation of the case, is error: Lee v. Newell, 107 Pa. 283; Stokes v. Miller, 10 W. N. C. 241.

The court should have simply instructed the jury to determine from the evidence what was the actual value of the services rendered by Wm. D. McFeaters, without any reference to the fact of his relationship with James McFeaters or to what might have been in their minds at the making of the agreement, and not embodied in its terms: Byrnes v. Clark, 57 Wis. 13; Manseau v. Mueller, 45 Wis. 430; Friermuth v. Friermuth, 46 Cal. 42; Swartz v. Hazlett, 8 Cal. 118; Miller's App., 100 Pa. 568; Kauss v. Rohner, 172 Pa. 481; Perkins v. Hasbrouck, 155 Pa. 494; Harrington v. Hickman, 148 Pa. 401.

An erroneous statement of the evidence upon the pivotal facts in the case, in the charge to the jury, is a cause of reversal: Steinbrunner v. Ry., 146 Pa. 504; Phila., etc., R. R. v. Alvord, 128 Pa. 42; Fawcett v. Fawcett, 95 Pa. 376.

The evidence as to the promise to pay for the services not mentioned in the within contract was sufficient: Glone v. Arleth, 162 Pa. 550; Miller's App., 100 Pa. 571.

*S. M. Jack, D. B. Taylor* and *W. L. Stewart,* for appellee, were not heard, but argued in their printed brief as follows: The charge was not erroneous: Kyle v. Electric Light & Power Co., 174 Pa. 470; Hall & Co. v. Woolen Co., 187 Pa. 18; Heydrick v. Hutchinson, 165 Pa. 208; Helzer v. Helzer, 187 Pa. 243.

In determining what reasonable recompense was, it was necessary for the jury to consider the surroundings, conditions, the relationship of the parties, what was in their minds and what the parties said at the time the contract was entered into as to the compensation: Meigs v. Lewis, 164 Pa. 597; Lacy v. Green, 84 Pa. 514; Erwin's App., 20 W. N. C. 278; 1 Addison on Contracts, * 182; Peoples N. Gas Co. v. Wire Co., 155 Pa. 22.

The declarations of a parent may admit the filial devotion and real worth of his child, and the profit he may derive from his services. They may reach farther and disclose his own sense of obligation and his settled purpose to compensate. But all this is insufficient to raise a promise: Leidig v. Coover, 47 Pa. 534; Zimmerman v. Zimmerman, 129 Pa. 229; Ulrich v. Arnold, 120 Pa. 170.

Per Curiam, October 31, 1898:

The contract between the plaintiff and his father being in writing, it was obligatory upon the father, and the plaintiff was entitled to recover on it. But the contract not having fixed upon the rate of compensation to be paid to the plaintiff for his services but, on the contrary, expressly provided that it should be a reasonable recompense, it necessarily devolved upon the jury exclusively to say how much it should be. The court properly left this question to the jury with correct instructions as to their duty. While it must be conceded that the remarks of the trial judge complained of in the first assignment were more redundant than the occasion required we cannot say there was positive error in them which we could regard as ground for reversal. The natural repugnance of most persons to contracts of this nature was some excuse for the comments of the court, but they were not erroneous in law.

The sixth assignment cannot be sustained. An attempt was made to recover for services outside the written agreement, but the testimony was properly rejected, as it was of the character we have so often condemned, and did not amount to a definite contract.

Judgment affirmed.