**G. H. McSHANE CO., INC., Plaintiff,**

v.

**Warren A. McFADDEN, Defendant.**

**Civ. A. No. 74–1046.**

United States District Court,
W. D. Pennsylvania.

March 15, 1976.

David L. McClenahan, Pittsburgh, Pa., for plaintiff.

Edmund K. Trent, Pittsburgh, Pa., for defendant.

## OPINION

SNYDER, District Judge.

This is a diversity action tried to the Court in which the Plaintiff Real Estate Agency seeks a commission from Warren A. McFadden for the efforts it expended in connection with McFadden's acquisition of two properties in the Pittsburgh area. Judgment will be entered in favor of the Defendant.

## I. HISTORY.

The Methodist Church Union (MCU) is a non-profit Pennsylvania corporation which carries out charitable activities in the Pittsburgh area under the auspices of the Methodist Church. In 1969, MCU decided to raze one of its church buildings, located at the corner of Smithfield Street and Seventh Avenue in the City of Pittsburgh, and to erect in its place a large office building in the hope that proceeds from such an operation would support further philanthropic activities.

G. H. McShane, the President and principal stockholder in G. H. McShane Company, Inc., a Pennsylvania corporation engaged in the real estate brokerage business, voluntarily sought out the D. D. Davis Construction Company of Youngstown, Ohio (Davis) and MCU thereafter engaged Davis to construct the building, secure the necessary financing, and look after the leasing of the building. Davis was successful in arranging for a construction loan through Mellon Bank, N.A., and in making arrangements with Prudential Insurance Company for a mortgage to take over the permanent financing if the building was completed by September 30, 1971.

MCU repeatedly encountered financial problems during the course of construction, so that it was unable to meet its commitments to the contractor as they fell due. There also developed a serious construction problem requiring extensive reworking of some of the structural steel when it was found that the building was sixteen inches shorter than called for in the plans. Thus by the summer of 1971, it became apparent

that Davis would not be able to complete construction within the time limitations set forth in the Prudential Take-Out Agreement. It was also apparent that a sufficient number of tenants had not been secured to provide adequate rent to meet the carrying charges of the building.

MCU recognized the danger that Prudential might not be bound by its commitment, and that MCU's investment in the property would be jeopardized if foreclosure of the construction mortgage occurred. MCU thus began to exert considerable efforts to sell Smithfield Plaza at a price which would allow it to recoup its equity in the property; such efforts, however, proved unsuccessful.

At this point, Dr. Allan J. Howes, Executive Director of MCU, proposed combining Smithfield Plaza with an undeveloped tract of approximately 360 acres (Epworth Woods) located some distance from the City of Pittsburgh, which was capable of conversion into a housing development. He envisioned the production of sufficient cash from Epworth Woods to sustain Smithfield Plaza until it would become self-financing. This idea was communicated to many real estate people, including G. H. McShane.

In September of 1971, G. H. McShane telephoned Warren A. McFadden, a real estate investor and developer in Fort Lauderdale, Florida with whom McShane had become acquainted in an earlier real estate transaction. He told McFadden about the Smithfield Plaza and Epworth Woods properties in some detail and explained the financial problems MCU had encountered in attempting to complete the development of Smithfield Plaza. McShane further informed McFadden that under the circumstances, MCU would probably accept substantially less than they already had invested in Smithfield Plaza but that as a result, MCU should not be expected to pay any real estate commission. In addition, McShane told McFadden of the various offers made for Smithfield Plaza, including one by the United Steel Workers of America to purchase for six million dollars. (There was also pending an offer for Epworth Woods for one million dollars.)

McShane at this point told McFadden that a real estate commission of $282,000 would normally be payable on these two sales, but if McFadden were to acquire the properties, McShane would be willing to bring about the transaction for a $150,000 commission. McFadden agreed that this was a reasonable amount in view of the selling price of the properties (which at the time were not producing any monies) but suggested that payment of the commission should be deferred until such time as either property yielded "sufficient revenue", to insure that such payment would not be a deterrent to the proposed transaction.

On October 4, 1971, McFadden and McShane had another discussion and McFadden decided to come to Pittsburgh to personally inspect the properties. McFadden arrived on October 5, 1971 and toured both properties in company with Dr. Howes, G. H. McShane and his brother, Hugh McShane, who was also employed by the McShane Agency. Later at dinner, McFadden outlined a rough proposal for the acquisition of both properties under a long term lease with options to purchase at various times during the term of the lease. In response to Dr. Howes' stated concern that MCU could not afford to pay any commission on the transaction, McFadden assured him that he (McFadden) and McShane "had an arrangement". At that time, McFadden also stated to Hugh McShane that he (McFadden) would be the one who would be paying the real estate commission.

MCU's Executive Committee on October 19, 1971, received McFadden's proposal to take a ninety-nine year lease on Smithfield Plaza and to pay MCU rentals, to be determined after deducting expenses from rents received. The proposal also included the purchase of Epworth Woods for one million dollars, which sum would be applied to the upkeep and maintenance of Smithfield Plaza until it became self-sustaining; and options to purchase Smithfield Plaza. When the Executive Committee expressed interest, McFadden presented a formal written proposal embodying the above terms on October 21, 1971, and following its presenta-

tion, when McFadden was not in the room, Dr. Howes informed the Committee that the proposal did not provide for payment of a real estate commission by MCU, as none was to be payable by them.

Between October and December of 1971, McFadden frequently visited Pittsburgh and Hugh McShane continued to perform many services for him. G. H. McShane, who at this time was living in Sarasota, Florida, also made many trips to Pittsburgh in connection with this transaction. On December 28, 1971, Prudential bought out the Mellon construction loan and McFadden took over Smithfield Plaza under the lease. On August 25, 1972, McFadden acquired title to Epworth Woods for the purchase price of one million dollars, payable on or before December 31, 1972. At this same time, MCU transferred the Smithfield Plaza land to McFadden's nominee, Con-Dev Dairy Corporation, for no additional consideration under an option to purchase for two and a half million dollars during the first twenty-five years of the ninety-nine year lease.

Not long afterward, on November 4, 1972, McFadden obtained a loan of $2,300,-000.00 from Great American Mortgage Investors (GAMI) for the development of Epworth Woods. Of that loan, $1,000,000.00 was used to pay the purchase price of Epworth Woods; $594,300.00 was used to replenish McFadden's line of credit at the Chase Manhattan Bank in New York City; $118,000.00 went for a small piece of land and dwelling adjacent to Epworth Woods (the Dessecker property); $109,371.72 was placed in a bank account entitled, "Warren A. McFadden, Escrow Account Epworth Woods"; and the remaining $478,328.28 was used to pay interest on the GAMI loan, or was not accounted for. Interest on the GAMI loan was paid through April of 1974, and the unpaid interest thereon from May 1, 1974 through November 30, 1975 (the Hearing date) amounted to $543,087.08.

Con-Dev received formal title to Smithfield Plaza, land and building, on April 19, 1973, and on May 8 and 9, 1974, McFadden transferred title to Epworth Woods to Schriber Deed Security, Incorporated, as there was an option agreement between McFadden and a third party to purchase approximately one-third of Epworth Woods. These transfers were made without the knowledge of G. H. McShane, and when he became aware of them he called McFadden to request payment of his commission. McFadden denied there was any agreement regarding a real estate commission, refused to discuss the matter, and directed McShane to his lawyer. Shortly thereafter this action was brought.

It is noted that Epworth Woods at the time of Hearing had produced no income, except for about $3,000 rental from the Dessecker Property. Smithfield Plaza sustained a net deficit in expenses over income through August 31, 1975 of $3,590,816.25, so that on September 8, 1975, Prudential foreclosed on its mortgage on Smithfield Plaza and purchased the premises.

## II. DISCUSSION.

There is little dispute that McShane brought together a willing buyer and a willing seller, and that no commission was to be paid by MCU. Nor is it controverted that G. H. McShane Co., Inc., through G. H. McShane and Hugh McShane, was the moving force in finding a buyer who had previously known nothing about the properties and who purchased them under terms and conditions which were satisfactory to MCU. But McFadden denies the existence of an enforceable contract.

During his first trip to Pittsburgh on October 5, 1971, McFadden assured Dr. Howes that MCU would not be responsible for payment of any commission by making it clear that there was an "arrangement" for the commission with McShane. This was reiterated by his statement to Hugh McShane that he (McFadden) "would pay Mickey's (G. H. McShane) commission". On December 20, 1971, G. H. McShane presented McFadden with a letter which set forth the terms of the commission agreement as follows:

"December 20, 1971

Mr. Warren McFadden
512 Intra Coastal Drive
Ft. Lauderdale, Fla. 33304
Dear Warren:

Jim Sweeny has advised me that it would be to each of our best interests to have a short memo of our agreement relating to my commission on the sale of the Methodist Church Union building in downtown Pittsburgh and the related conveyance of the Church Union's North Hills property.

As I recall, our understanding was that the total McShane Agency's commission on both of these transactions was to be $150,000.00, should you or your nominee eventually acquire ownership of the downtown building (but not necessarily the land beneath it) and the North Hills property. In order that this project will not be burdened with front-end expenses which it can scarce afford, I have also agreed that this amount need not be paid unless and until sufficient revenues are available to you out of the development in North Hills or building operation downtown to pay the fees. I do not believe that we have reached an exact agreement as to what amount of revenues should be considered 'sufficient', but I am happy to leave this to your reasonable judgment. I would hope that sometime we might be able to set an outside limit on the time within which that commission would be payable.

If the above, accurately reflects our understanding, please sign and return the enclosed copy of this letter.

Yours very truly,
/s/
G. H. McShane

Accepted: _____

Date: _____
"

The testimony varies considerably from this point. McShane says he handed the letter to McFadden in an envelope which McFadden put into his coat pocket and never returned. McFadden recalls receiving and reading the document, but says he immediately returned it to McShane, telling him there was no commission agreement and that McShane "must be crazy".

There is no dispute that G. H. McShane continued to render service by meeting with McFadden in Pittsburgh on numerous occasions, with McFadden's architect, and with engineers and planners to secure additional tenants for Smithfield Plaza. This conduct is consistent with McShane's, and not McFadden's, testimony as to what happened to the letter, and we therefore give credence to the explanation given by G. H. McShane.

Hugh McShane testified that for approximately two years, beginning October 5, 1971, he spent an average of two to three days a week on McFadden's behalf, long after McFadden's alleged rejection of any commission agreement. McFadden admitted having dinner with Hugh McShane and his wife after the letter incident, and he did not deny acknowledging at that time that he owed McShane Company a commission on the acquisition of the two properties. Moreover, McFadden gave the fact that he owed McShane Company a real estate commission as one of the reasons he could not accommodate a later request by Dr. Howes for an increase in his salary as a Developing Agent for McFadden. McFadden repeated his obligation to G. H. McShane in the early spring of 1973, and again to Hugh McShane that summer.

Under the testimony, we find that when G. H. McShane called McFadden in September of 1971 and described the property in detail, McFadden agreed that he would pay a commission of $150,000.00. The subsequent events, including the incident of December 20, 1971, corroborate the agreement as made and as reflected in the December 20, 1971 letter quoted above.[1]

1. We thus do not have a question here of possible acceptance of the commission contract by silence in connection with the incident of December 20, 1971 [but see *Baum's Estate,* 274 Pa. 283, 117 A. 684 (1922)], or a case in which it may be argued that McFadden, under the circumstances, can be said to be estopped to deny acceptance. *See* Restatement *Contracts*

## A. THE TERMS OF THE AGREEMENT.

We must then determine whether or not a commission in the amount of $150,000.00 which was not to be paid unless and until "sufficient revenues" were available out of the development of Epworth Woods or the operation of Smithfield Plaza, is an enforceable agreement. The commission was to be paid out of "revenues" generated from either Smithfield Plaza's operations or development of Epworth Woods which were over and above those necessary to make Smithfield Plaza self-sustaining. We find that McFadden was to pay the commission only when these revenues were "sufficient", and the determination of such sufficiency was left to McFadden's "reasonable judgment". We observe that this is not a situation where the promisor is given an unlimited and unfettered right to determine the time for performance and, thus, an unenforceable promise: *see D'Orazio v. Masciantonio,* 345 Pa. 428, 29 A.2d 43 (1942); *Nelson v. Von Bonnhorst,* 29 Pa. 352 (1857). *Cf. Field v. Golden Triangle Broadcasting, Inc.,* 451 Pa. 410, 305 A.2d 689 (1973), *cert. denied* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974). McFadden was obligated to perform when in the exercise of a reasonable judgment there were sufficient revenues. The facts here presented are analogous to those before the Court in *Schleicher v. United Security Life Ins. & Trust Co.,* 191 Pa. 477, 43 A. 380 (1899), where under the terms of the agreement an elevator was to be paid for when it was working to the satisfaction of the owner. The Court held that the time to satisfy the owner would be construed as being a "reasonable" time and left to the jury the determination of whether or not the plaintiff had such a "reasonable" time. Thus in *McFeaters v. Pattison,* 188 Pa. 270, 41 A. 609 (1898), a contract provided that a son receive "reasonable" compensation for caring for his father and the Court held the agreement to be enforceable, leaving the question of amount to the jury.

Particularly instructive is *Pillois v. Billingsley,* 179 F.2d 205 (2d Cir.1950), where plaintiff travelled to France on behalf of the defendant and there secured a contract for defendant under an agreement drafted by defendant's attorneys and signed by the plaintiff, which stated (at p. 207):

" 'This will confirm our understanding in connection with the exclusive representation of the S. A. Le Galion trade mark under contracts of March 20, 1946 and July 25, 1946, now being held by Cigogne, Inc., a New York corporation by assignment from Chapman & Keane, as follows:

\*　　\*　　\*　　\*　　\*　　\*

'My compensation for such services as I may render in this connection shall be such sum as you, in your sole judgment, may decide is reasonable. . . .' "

Defendant failed to pay plaintiff under the terms of the agreement, and in an action brought by the plaintiff, the Court held (*Id.*):

"*This letter, as the trial judge held, shows an agreement which is not too indefinite to be enforced, the appellee having performed his part of it.* It entitled him to have the appellant in good faith determine the reasonable value of his services and to pay him that amount. *Cf. Ake v. Chancey,* 5 Cir., 149 F.2d 310. *See* 1 Williston on Contracts, § 43. And when the appellant failed to make any determination whatever as to what such services were reasonably worth the appellee became entitled to recover as on a quantum meruit basis. *Von Reitzenstein v. Tomlinson,* 249 N.Y. 60, 162 N.E. 584; *Varney v. Ditmars,* 217 N.Y. 223, 111 N.E. 822, 823, 825, Ann.Cas. 1916B, 758; *Canet v. Smith,* 173 App.Div. 241, 159 N.Y.S. 593 (1st Dep't).

§ 72; Sum.Pa.Jur. *Contracts* §§ 203–204 (1955); *Gum, Inc. v. Felton,* 341 Pa. 96, 17 A.2d 386 (1941). Instead, the contract was created in the parties' initial discussion of September 1971; and the subsequent acts of McFadden in accepting the benefits of McShane's efforts, the letter incident, and McFadden's acknowledgment of his indebtedness to McShane stand not as an acceptance of the contract or as elements tending to establish an estoppel, but rather serve as evidence of an already existing contractual obligation.

We are here dealing with the legal results which flow from the performance by one party to a contract and not with what legal obligations, if any, are created by a wholly executory contract. *See* 1 Williston on Contracts § 49. It may be acknowledged that the appellant was not satisfied with the terms of the contract procured from the French manufacturer because, among other things, the territory embraced in the former contract was diminished, but the fact remains that Cigogne, Inc., did accept it, as both its answer admits and the evidence clearly shows." [Emphasis added]

While the amount of compensation was not fixed in *Pillois* under a contract which called for reasonable compensation without stating an amount, the Court held as noted above that the party valuing compensation must make such a determination in good faith, pointing up the principle that in a case of a contract fully performed on one side, as is the situation in the instant case, the failure of the contract to set forth an element such as time of payment or amount with exactness will not make the contract void.

Similarly instructive is the language of the Sixth Circuit Court of Appeals in *Hogan v. Wright*, 356 F.2d 595 (1966), where Wright retained Hogan as his lawyer in settling a construction contract dispute. Hogan billed Wright $15,000.00 for his services and, in addition, offered to prepare a claim for Wright on a related matter before a State Board, stating, "Out of any recovery in your claim, you are to pay me a percentage figure acceptable to you." Wright received $137,314.81 and determined that $2,000.00 would be adequate payment, although the Court found additional services to have a reasonable value of $27,-468.36.

The Court stated (at pp. 597–598):

"As a general rule, a wholly executory agreement which reserves to the will and discretion of one party the unlimited right to determine the extent of compensation he will make is too indefinite to be enforceable. I Corbin on Contracts, Section 98; 17 Am.Jur.2d, Contracts, Section 83. Here, however, is a contract where the promisor has fully performed, and the promisee has the unlimited right to determine the amount of compensation he will pay the promisor for the services rendered. The cases are in conflict as to the manner of measuring the adequacy of the compensation rendered by the one party. The facts of each case generally suggest the appropriate rule. Recovery has been allowed for the reasonable value of such services where the facts disclose that this was the intention of the parties or where the express reservation to one party to determine the fee is coupled with the provision that the payment to be made shall be 'reasonable', 'fair', 'right', or 'good'. *Foster v. Young,* 172 Cal. 317, 156 P. 476; *Corthell v. Summit Thread Co.,* 132 Me. 94, 167 A. 79, 92 A.L.R. 1391; *Pillois v. Billingsley,* 179 F.2d 205 (C.A.2, 1949); *Millar v. Cuddy,* 43 Mich. 273, 5 N.W. 316, 92 A.L.R. 1391. Other cases have held that where the promisor has determined the amount to be paid, no more can be recovered. This is especially true where the promisor has acted in good faith, although the compensation is considerably less than the reasonable value of the services. *Lee's Appeal,* 53 Conn. 363, 2 A. 758 (1886); *Butler v. Winona Mills Co.,* 28 Minn. 205, 9 N.W. 697 (1881); *Tennant v. Fawcett,* 94 Tex. 111, 58 S.W. 824 (1900).

No arbitrary formula can be applied. The facts of each case must be considered to determine the intentions of the parties. Their intent should suggest whether the compensation to be paid will be measured in terms of reasonable value or in terms of good faith. . . .

\* \* \* \* \* \*

Since Hogan drafted the contract, he was in a position to state exactly what his terms of employment were. If he wanted a definite percentage of the recovery he could have so stated. If he wanted a reasonable fee, he could have so stated. Where a party competent to contract and skilled in the art of drafting contracts

recites therein conditions of his own choosing, in language of his own choosing, he cannot complain when the other party to the contract exercises his rights in good faith."

■ We conclude that in the matter *sub judice* there was an enforceable contract. The parties agreed, and the Court finds, that the contract provided that McFadden would pay McShane a real estate commission of $150,000.00 when sufficient revenues existed, and that determination was to be made using a standard of objective reasonableness.

McFadden does not claim that he has made any assessment as to whether or not sufficient revenues exist; however, he now offers evidence that there never were any "revenues".

## B. THE MEANING OF "SUFFICIENT REVENUES".

In determining the intention of the parties with respect to the meaning of the term "sufficient revenues", we are reminded by Judge Becker in *BBCI, Inc. v. Canada Dry Delaware Val. Bottling Co.*, 393 F.Supp. 299 (E.D.Pa. 1975) (at p. 301):

". . . If [a contract's] provisions are ambiguous or obscure, then its interpretation becomes a question of fact for the jury, and parole evidence is admissible to aid in this interpretation. If its provisions are unambiguous and clear, then its interpretation becomes a question of law for the Judge, and parole evidence is not admissible. The question of whether its provisions are ambiguous or obscure on the one hand, or unambiguous and clear on the other hand, is a question of law for the Judge. [Citations omitted]"

From a reading of the contract it is unclear whether the parties used the term "revenues" to indicate that payment would be made only out of an excess of the difference between receipts and expenses, or whether payment was to be made out of any monies which might be generated from the properties, regardless of the means of such generation (*i.e.*, by mortgage, selling of options, or only by rental incomes).

Instances can be found where "revenue", because of the particular context in which the word is used, has an easily determined meaning. Thus, in *George v. City of Asheville, N.C.*, 80 F.2d 50 (4th Cir. 1935), in determining whether a municipal water and sewer system was "revenue" producing, revenues were held to mean any income without a determination of net profit.

The American Institute of Certified Public Accountants has stated:

"Revenue under present generally accepted accounting principles is derived from three general activities: (a) selling products, (b) rendering services and permitting others to use enterprise resources, which result in interest, rent, royalties, fees, and the like, and (c) disposing of resources other than products—for example, plant and equipment or investments in other entities. *Revenue does not include receipt of assets purchased, proceeds of borrowing,* investments by owners, or adjustments of revenue of prior periods." [Emphasis added] *Statement, The Accounting Principles Board 4* § 148 (1970), CCH 3 Professional Standards § 1026.12 (1974).

Consistent with this statement is the language of *People v. New York Central R. Co.*, 24 N.Y. 485 (1862), wherein it was noted (at pp. 489–490):

". . . Revenue, when used of individuals [as opposed to governments], is equivalent to income, which is the true sense generally used to designate the annual receipts, and includes receipts from all sources—at least, all permanent sources of profits or rent.

\* \* \* \* \* \*

. . . 'Revenue' is a return for capital invested or labor bestowed. In a general sense, it is the annual rents, profits, interests or issues of any species of property, real or personal, belonging to an individual or the public . . . *It is not the money borrowed by the owner.* . . ." [Emphasis added]

But in *Willoughby v. Willoughby*, 66 R.I. 430, 19 A.2d 857 (1941), decedent's will con-

tained a provision that his wife, during her life or widowhood, should receive all of the revenues of his estate. In determining testator's intentions, the Court stated (19 A.2d at p. 860):

"In Webster's New International Dictionary, 2d Ed., p. 2132, the word 'revenue', in both singular and plural forms, is defined as 'Return; yield, as of land; profit. * * * That which returns, or comes back, from an investment; the annual or periodical rents, profits, interest, or issues, of any species of property, real or personal; income.' See also People v. New York Central R.R. Co., 24 N.Y. 485, 490; Bates v. Porter, 74 Cal. 224, 15 P. 732. There being nothing in the will before us to indicate that the word 'revenues' was used by the testator with any special meaning, it is clear to us that it was testator's intention to devise and bequeath to his wife for her life, provided she remained his widow, the 'net income' from all his property, . . ." [Emphasis added]

Webster's Third New International Dictionary (1971) defines revenue (as here relevant) as, "the income that comes back from an investment", "the annual or periodical rents, profits, interest, or issues", "investment income as distinguished from salary, wages, or donations", "an item of income", "the total income produced by a given source".

We conclude that while the term revenue has no legally definable meaning, the term under the circumstances of this case does not include the proceeds of loans such as the GAMI loan here.

## C. REVENUE AS PROFIT.

The record here reveals that gross rental income from Smithfield Plaza from September, 1972 through August, 1975, was $1,066,361.65. The sale of an option in connection with the Epworth Woods operations generated cash in the amount of $51,068.00. However, the net loss on the operations of Smithfield Plaza was $3,590,816.00 and the net operating loss on Epworth Woods was $492,019.00. Smithfield Plaza, because of its low occupancy rate, was at least a short term money loser. This was precisely why MCU combined Smithfield Plaza with Epworth Woods into one package. It was hoped that Epworth Woods would develop quickly and generate funds large enough to equalize the losses from Smithfield Plaza until its occupancy reached a self-sustaining level of income. Apparently, this was the reason the commission was made payable only when, by reasonable judgment, funds were found to be sufficient to pay the commission from either (1) Smithfield Plaza's net funds, or (2) those of Epworth Woods. Neither of the parties contemplated that gross receipts would be the basis for calculation of "sufficient revenues".

G. H. McShane initially stated in his deposition that he understood "revenues" to include only income in excess of the operational costs of the properties. When questioned further, he then amplified and refined his statement, as follows:

"Q  By revenues, you would mean to include money that was raised by way of a loan?

A  Sale, loan, anything, as long as it is cash, yes, sir."

That position was adopted again by McShane at the trial. However, the Court finds it highly significant that counsel for McShane did not urge the Court to weigh the gross rentals from Smithfield Plaza in determining whether "sufficient revenues" had been accumulated, claiming only that we should look to the $1,300,000.00 excess of the GAMI loan.[2]

---

**2.** We have already noted that the GAMI loan proceeds are not properly includable as "revenues"; we thus cannot say that McFadden should have paid the McShane Company commission directly out of those proceeds. However, even if we were to find that McFadden improperly applied the loan proceeds and thereby acted in derogation of the contract, it

would be highly speculative and therefore improper for this Court to hold under the evidence that the GAMI loan proceeds, spent on the development of Epworth Woods, would have generated enough revenue to sustain Smithfield Plaza until it became self-sufficient, much less hold that those revenues would have

## III. CONCLUSION.

■ We find that the contract's "sufficient revenues" provision did not include the proceeds of loans. We further conclude that the term was used to cover gross profit, and that a determination of the existence of such gross profit was to be made based on the occurrence of one of two alternatives,[3] as detailed above. Given these findings, it is clear to this Court that although McFadden did not make the required good faith, reasonable evaluation of the existence of sufficient revenues, such revenues did not in fact exist. The Plaintiff has therefore failed to prove an essential element of his case, namely, that the contingency provided for in the contract occurred. Judgment will be entered in favor of the Defendant and against the Plaintiff, without prejudice to the rights of the Plaintiff from

showing in another case that the contingency has been satisfied.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law, as required by Rule 52(a), Federal Rules of Civil Procedure, and an appropriate Order will be entered. ·

been sufficient to sustain Smithfield Plaza with revenues remaining. [See note 3, infra.]

3. Counsel have vigorously argued their respective positions as to the effect of McFadden's sale of Epworth Woods. Counsel for McShane Co. urges that these actions constituted an anticipatory breach of the commission contract and that such a breach gives rise to an action for the reasonable value of the services provided. *Cameron v. Eynon,* 332 Pa. 529, 3 A.2d 423 (1939). Defendant on the other hand claims that the doctrine of anticipatory breach has no application to situations such as this where the contract is fully performed on one side, citing *inter alia Mack v. Revicki,* 47 N.J.Super. 185, 135 A.2d 569 (1957). *See also, Smyth v. United States,* 302 U.S. 329, 58 S.Ct. 248, 82 L.Ed. 294, 295 (1937); *Annot.,* 105 A.L.R. 460. Although we agree with Defendant's general statement of the law, we note that the cases he cites are distinguishable from the case at bar. For example, *Mack* did not involve, as here, a situation wherein the defendant sold the land which was the basis for calculating the sufficiency of revenues.

This Court views the problem of McFadden's sale of Epworth Woods as covered by § 295 of the *Restatement of Contracts,* which provides:
"If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened non-performance of the return promise does not discharge the promisor's duty, unless

(a) the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party; or
(b) the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party."

As this Court reads § 295, McShane Co., the party asserting excuse of a condition imposed by the contract, is bound to come forward with proof tending to show that the condition, to-wit, sufficient revenues, would have occurred but for McFadden's sale of Epworth Woods. *Hartman v. Meighan,* 171 Pa. 46, 33 A. 123 (1895), although standing for the proposition that a party who *fails to perform* on the basis that he was prevented from doing so must prove that he was so prevented, also supports, in our view, the conclusion that McShane here was obligated to prove by a fair preponderance of the evidence that the condition was not met because of the breach. We further believe that in this case the credible evidence indicates that McFadden's sale of Epworth Woods did not affect the fact that there did not exist sufficient revenues (as we have determined that term to be) for the payment of the commission contract. Thus, because it has not been proven that "the condition [the existence of sufficient revenues] would have occurred . . . except for such prevention or hindrance" [McFadden's sale of Epworth Woods], and McShane's claim on this ground, which was not the subject of a contract provision, must accordingly fail.